PEOPLE v DAWSON

Docket No. 79479. Argued November 3, 1987 (Calendar No. 4). Decided August 24, 1988.

Robert C. Dawson was charged in the Kalamazoo Circuit Court with assault with intent to commit sexual penetration. The court, John E. Fitzgerald, J., granted the defendant's motion for mistrial after the prosecutor misstated the evidence. Prior to the second trial, the defendant moved to bar retrial on the basis of double jeopardy. The court, Fredric A. Grimm, J., denied the defendant's motion, finding that because the defendant retained primary control over the course followed in the original trial, retrial was not barred. Following the second trial, the defendant was convicted by a jury. The Court of Appeals, WALSH, P.J., and MACKENZIE and R.R. FERGUSON, JJ., reversed, holding that jeopardy had attached and that retrial was precluded because the prosecutor had consciously and wilfully engaged in improper conduct, indifferent to the probability that a mistrial would result (Docket No. 65415). The people appeal.

In a unanimous opinion by Justice LEVIN, the Supreme Court *held:*

Retrial of a criminal defendant is barred where the prosecutor intended to goad the defendant into moving for a mistrial.

1. An accused's protection against being twice placed in jeopardy for the same offense may bar retrial where the initial prosecution ends in a mistrial. Where the motion for mistrial is made by the prosecutor or by the trial court, sua sponte, and the prosecutor or judge made an apparently innocent error, or where the conduct prompting the mistrial was outside their control, retrial will be allowed where manifestly necessary. Where the motion for mistrial was made by the defendant or with his consent and the mistrial was caused by innocent conduct of the prosecutor or judge, or by factors beyond their control, or by the conduct of defense counsel, retrial generally

REFERENCES

Am Jur 2d, Criminal Law § 286.

Am Jur 2d, Trial §§ 192, 1104.

Double jeopardy as bar to retrial after grant of defendant's motion for mistrial. 98 ALR3d 997.

is allowed. However, where prosecutorial conduct provokes the defendant's motion for mistrial, the defendant may not have waived double jeopardy protection.

2. A retrial is an exception to the general double jeopardy bar. Where a mistrial results from apparently innocent or even negligent prosecutorial error, or from factors beyond the prosecutor's control, the public interest in allowing a retrial outweighs the double jeopardy bar. The balance tilts where, on the basis of the objective facts and circumstances of the case, the trial court finds that the prosecutor intended to goad the defendant into moving for a mistrial. Because in this case the people conceded at oral argument that the trial prosecutor intended to bring about a mistrial, remand to the trial court for such finding of fact is not necessary, the result reached by the Court of Appeals is affirmed, and retrial is barred by the Double Jeopardy Clause.

Affirmed.

154 Mich App 260; 397 NW2d 277 (1986) affirmed.

1. CRIMINAL LAW — CONSTITUTIONAL LAW — MISTRIAL — PROSECUTO-RIAL MISCONDUCT.

Retrial of a criminal defendant is barred where the prosecutor intended to goad the defendant into moving for a mistrial (US Const, Am V; Const 1963, art 1, § 15).

2. CRIMINAL LAW — CONSTITUTIONAL LAW — DOUBLE JEOPARDY — MISTRIAL — PROSECUTORIAL MISCONDUCT.

Retrial of a criminal defendant may be barred on double jeopardy grounds where a mistrial is declared; the focus is on the nature of the conduct prompting the mistrial, and retrial will be allowed if the declaration of the mistrial was manifestly necessary; however, where a defendant's motion for mistrial is prompted by intentional prosecutorial misconduct the defendant may not have waived double jeopardy protection (US Const, Am V; Const 1963, art 1, § 15).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *James J. Gregart,* Prosecuting Attorney, and *Michael H. Dzialowski,* Assistant Prosecuting Attorney, for the people.

*Milton J. Marovich* and *John R. Scholten* for the defendant.

LEVIN, J. The double jeopardy provisions of the

Michigan[1] and federal[2] constitutions protect an accused from being twice put in jeopardy for the same offense. "Being twice put in jeopardy" includes being subjected to a retrial after the initial prosecution ends in a mistrial.[3] An exception to the double jeopardy bar has been made, and retrials allowed, where the prosecutorial or judicial errors requiring the mistrial appear to have been innocent[4] or were beyond the prosecutor's control.[5] A general exception has also been made where the mistrial was granted on the defendant's motion or with his consent.[6] Where prosecutorial conduct provoked the defendant's motion for mistrial, however, the Double Jeopardy Clause has sometimes been held to bar retrial.[7]

This appeal presents the question when, where the court finds that prosecutorial conduct provoked a defendant's motion for mistrial, the double jeopardy provision bars retrial. We adopt the federal standard and hold that retrial is barred where the prosecutor intended to goad the defendant into moving for a mistrial.

In this case, counsel for the people conceded at

---

[1] Const 1963, art 1, § 15.

[2] US Const, Am V. The federal provision applies to the states through the Fourteenth Amendment.ʼ *Benton v Maryland,* 395 US 784; 89 S Ct 2056; 23 L Ed 2d 707 (1969).

[3] The accused is placed in jeopardy once a jury has been selected and sworn. *People v Barker,* 60 Mich 277, 290; 27 NW 539 (1886). See also *Crist v Bretz,* 437 US 28; 98 S Ct 2156; 57 L Ed 2d 24 (1978).

[4] For example, an error in drafting an indictment. See *Illinois v Somerville,* 410 US 458; 93 S Ct 1066; 35 L Ed 2d 425 (1973).

[5] For example, where a mistrial is declared because of a juror's misconduct, or his illness, disability, or death. See *Thompson v United States,* 155 US 271; 15 S Ct 73; 39 L Ed 146 (1894); *Simmons v United States,* 142 US 148; 12 S Ct 171; 35 L Ed 968 (1891); *People v Grimmett,* 388 Mich 590, 598; 202 NW2d 278 (1972), rev'd on other grounds *People v White,* 390 Mich 245; 212 NW2d 222 (1973); *People v Hutchings,* 137 Mich 527; 100 NW 753 (1904).

[6] *People v Grimmett,* n 5 *supra.*

[7] See, e.g., *United States v Martin,* 561 F2d 135 (CA 8, 1977); *United States v Kessler,* 530 F2d 1246 (CA 5, 1976).

oral argument in this Court that the trial prose-
cutor intended to bring about a mistrial. But for
such concession, we would remand to the trial
court for a factual determination. We affirm the
result arrived at by the Court of Appeals reversing
Robert Dawson's conviction.

I

Dawson was charged with assault with intent to
commit sexual penetration.[8] The crime was alleged
to have occurred early in the morning of June 28,
1981,[9] in Kalamazoo. The prosecutor alleged that
Dawson lured complainant Mark Nelson to Daw-
son's home and that, when Nelson became uneasy
and left, Dawson forced him at knife point to a
small park near Dawson's home, where Dawson
attempted to force Nelson to submit to anal inter-
course. According to the prosecution, Nelson man-
aged to struggle free and escape to a nearby street,
where he was first struck by a truck and then
taken to a hospital by passers-by. The prosecu-
tion's only evidence that Dawson assaulted Nelson
was Nelson's testimony.

Dawson denied assaulting Nelson. He claimed
that Nelson paid him to submit to sexual contact,
and that Nelson suggested using the park. When
Dawson was unable to complete the act, Nelson
became hysterical and ran away.

The prosecutor first called Terry Sweeney, who
had accompanied Dawson earlier in the evening in

[8] MCL 750.520g(1); MSA 28.788(7)(1).

[9] There was some confusion whether the alleged crime occurred late
in the evening of the 27th or early in the morning of the 28th. The
prosecutor at the original trial claimed that the initial contact be-
tween Nelson and Dawson and the assault itself occurred on June 28.
The prosecutor at retrial (not the original prosecutor) asserted that
the preliminary events occurred on the 27th, with only the assault
itself occurring on the 28th. Defense counsel did not contest this
assertion.

question. There was no substantive direct or cross-examination. The prosecutor then called Detective Robert Gay of the Kalamazoo police. Again there was no direct examination. On cross-examination, Detective Gay stated that he had found no signs of any struggle when searching the area where Nelson claimed he had struggled with Dawson. On redirect examination, Detective Gay stated, to the prosecutor's apparent surprise,[10] that he had not recovered any evidence at all from the park.

The prosecutor next called Nelson. Nelson was twenty-three years old at the time of the original trial, twenty-two at the time of the alleged assault. Nelson testified that on the evening in question he was sitting alone watching television in his girl friend's ground floor apartment. Two men came to the door. Nelson testified that one, Dawson, said that they had been walking by and had seen the gymnastic photos which Nelson's girl friend had on the walls of her apartment. Nelson said that he invited them inside. Nelson said that they remained for a total of fifteen minutes, that each of the three men drank one or two beers, and that they talked generally of their work and of sports. Nelson testified that he and Dawson then left together.[11]

---

[10] The prosecutor asked the question twice.

*Q.* Can you tell me what, if anything, you found?
*A.* Nothing.
*Q.* Absolutely nothing?
*A.* Nothing.

At the original trial no witness testified to recovering any evidence from the scene of the alleged assault. At the retrial, Officer John Shubnell of the Kalamazoo Police, who was not called at the original trial, testified to visiting the scene with Nelson in the early morning hours after the assault was alleged to have occurred, and recovering a pair of crutches and a shirt which Nelson identified as his.

[11] When asked what had happened to Dawson's friend, Terry Swee-

Nelson testified that he left with Dawson because he had run out of beer, and that Dawson had suggested that they go to the house of a friend of Dawson's, obtain some beer there, and return to Nelson's girl friend's apartment. Nelson agreed. With his right leg encased in a cast from ankle to hip,[12] Nelson proceeded on crutches to what he thought was Dawson's friend's house, which was approximately a ten-minute walk from the apartment.

Nelson said that Dawson unlocked the door and went inside, with Nelson following.[13] Dawson then went down into the basement for several minutes. When he returned he asked Nelson if he wanted to see the basement. Nelson said no and further told Dawson that he was going back to the apartment. Nelson testified that he then walked out of the door.[14]

According to Nelson, after he had taken just several steps (still using his crutches) Dawson "grabbed [him] by the back of [his] collar and had [a] knife in [his] back and said 'Keep walking and shut up.' "[15] Nelson said that he then dropped his crutches and hobbled along in front of Dawson.

The two proceeded alongside some railroad tracks. Along one side of the tracks was a creek. Nelson testified that he thought that if he could reach the creek, he could break his cast and run away from Dawson. Nelson said that he struggled

ney, Nelson said that in fact he had left "maybe a minute" after arriving, and had apparently not had any beer or talked with the other two.

[12] Nelson had broken his ankle while performing gymnastics.

[13] Nelson testified that he thought that since Dawson had a key to the house it was really Dawson's house, and not his "friend's."

[14] Nelson made no mention of Terry Sweeney arriving at the house.

[15] When asked by the prosecutor whether the knife was actually stuck in his back or just pressed against it, Nelson repeated that it was "in [his] back."

with Dawson,[16] who still had hold of his collar and had a knife stuck into his back, escaped and ran into the creek. Dawson was right behind. Nelson said that his cast did break at the ankle and knee.

Nelson said that he and Dawson struggled in the creek. Dawson choked Nelson[17] and told him that if he made any noise, Dawson would kill him. Nelson said that while Dawson was choking him he was also cutting Nelson with the knife. Nelson testified that he was cut on his thumb, neck, and back. Nelson said that Dawson was also trying to get Nelson's pants off. Nelson repeatedly testified that Dawson did not say why he wanted to get Nelson's pants off.

Nelson testified that he then grabbed the knife (which had ended up in the weeds) and "grabbed a hold [sic] of this tree and pushed away from [Dawson] and took off from [Dawson]." Nelson ran across a little field toward a street. Dawson "took a dive" at Nelson, but Nelson rolled away and went into the street to try and wave someone down. Nelson said that he tried waving down a truck, but the truck did not stop. Nelson fell back against the curb, and the truck ran over his cast. A young man and young woman driving home from a late-night date saw Nelson, offered help, and took him to the hospital.

Defense counsel then began his cross-examination. Nelson said that Dawson came to the door of the apartment at approximately 8:00 P.M. Nelson then said that, contrary to his earlier testimony, both Dawson and Dawson's friend (Terry Sweeney) stayed for some fifteen minutes in the apartment.

---

[16] Dawson held a black belt in karate.

[17] Nelson told the prosecutor that Dawson's choking did not leave any marks on his neck. This statement contradicted the prosecutor's assertion in his opening statement that the jury would see photographs of the bruises on Nelson's neck caused by the choking.

Dawson and his friend were "jumping around doing something," putting on some kind of a play fight. Dawson's friend then left, and just Nelson and Dawson drank beer. Nelson then reasserted that the only reason he agreed to go on crutches over to what he thought was Dawson's friend's house was to obtain some more beer. Nelson acknowledged that there was a store selling beer directly across the street from the apartment.

Nelson said that approximately a half-hour to forty minutes elapsed between meeting Dawson and being taken to the hospital. After pressing by defense counsel, he expanded this estimate to an hour.[18]

Nelson made a number of denials. He denied that he initiated contact with Dawson. He denied that Dawson and his friend left the apartment, bought some beer, and then returned. He first denied that Dawson returned after leaving with his friend,[19] but then said that Dawson did leave with his friend and then returned alone. He denied paying Dawson for sexual contact.

Nelson stated for the first time that his girl friend had returned to the apartment while Dawson was still there. Nelson maintained his original version that he had been cut a number of times on the neck, even though the photograph taken at the hospital did not show such cuts.[20]

On redirect examination, Nelson returned to his direct examination testimony that Dawson did not leave the apartment and then return, but rather that Dawson and his friend arrived, the friend left,

[18] So that assuming, as Nelson said, he first met Dawson at 8:00 P.M., the assault would have been over by 9:00 P.M.

[19] This denial was consistent with his direct testimony.

[20] The photograph showed only the front of Nelson's neck. After viewing the photograph, Nelson said that the cuts were on the back of his neck. He admitted, however, that the only purpose of the photograph was to record his injuries.

and then Nelson left with Dawson. Nelson for the first time said that when Dawson was trying to pull Nelson's pants down, Dawson told Nelson that the reason he wanted to do so was to force Nelson into having anal intercourse.[21] Nelson was then excused.

After calling Officer Cristopher Sorrentino of the Kalamazoo Police, who gave no substantive testimony, the prosecution called Toni Hramika, Nelson's girl friend and the tenant of the apartment where Nelson and Dawson met. Hramika worked at a restaurant near her apartment. The night of the alleged assault, she returned home between 7:00 and 9:00 P.M. Nelson was there, sitting outside the front door drinking beer with Dawson. Hramika said, contrary to Nelson's testimony, that Nelson and Dawson went across the street, bought beer at the store there, and then returned to the apartment. Hramika overheard them discussing going over to Dawson's house.[22] Contrary to Nelson's testimony that the only reason he left with Dawson was to obtain some beer, Hramika testified that she heard Nelson and Dawson discussing going over to Dawson's house to obtain marijuana.

Nelson said that he would be back in fifteen minutes, but he was not. Hramika had made plans to spend the night at a girl friend's apartment. She waited for Nelson for half an hour and then left. She repeatedly called her apartment from her girl friend's, and Nelson finally answered between 11:15 and 11:45 P.M. Hramika said Nelson sounded

[21] Prior to redirect examination there had been a consultation between counsel and the judge and a short recess. During the consultation the judge pointed out to the prosecutor that Nelson's direct testimony failed to establish an element of the charged crime—that Dawson intended to sexually assault Nelson. During the subsequent recess, the prosecutor talked with Nelson. Nelson denied that the prosecutor told him what to say.

[22] Hramika made no mention of their discussing going to Dawson's "friend's" house.

"very shaken up." She said that Nelson accused Dawson of trying to rape him.

On cross-examination, Hramika admitted that several days after the alleged assault she had told Detective Gay that on the evening in question she had arrived home between 11:30 P.M. and midnight, not between 7:00 and 9:00 P.M. Hramika also testified that, contrary to Nelson's assertion that Dawson had stuck the knife into his back, she had seen no cuts on his back. She was not sure whether there were cuts on his neck.

The prosecutor then called Angela Hosek. She and Scott Courtney were driving home from a date and had stopped at the intersection where Nelson testified he had tried to wave down a truck. Hosek said she saw Nelson fall off the side of a van.[23] Hosek said that Courtney then rolled down his window, asked Nelson if he needed help, and went out to help him. Hosek also went over to Nelson. Nelson told them that somebody had tried to rape him. They took him to the hospital.

On cross-examination, Hosek confirmed that she did not see Nelson standing in the street trying to wave someone down. Rather, she saw him fall off the side of a van. Furthermore, she said that this occurred at 1:00 A.M., four hours later than the time to which Nelson testified.

Courtney, the next witness, while generally corroborating Hosek's testimony, testified that Nelson related an account to him[24] that was entirely different from Nelson's testimony in court. Nelson told Courtney that

> he was walking home or he was on crutches at that time because the leg was broken previously

---

[23] She was sure it was a van and not a truck.

[24] Apparently Nelson related this version to Courtney before Hosek arrived.

and a man offered him a ride so he accepted it. He waundered [sic] back to his apartment and that's when he [sic] tried to sexually assault him and he broke away and then he went on to say that his arms and his hands hurt and that he used a knife that was about that [six to eight inches] big.

On cross-examination, Courtney confirmed Hosek's statement that 1:00 A.M. was the time they first saw Nelson. Courtney affirmed that Nelson told him that he had been walking home, was offered a ride by someone, accepted it and ended up at this person's apartment.[25] Courtney said that Nelson told him that Nelson knew where his assailant lived and was going to "get" him. Nelson did not complain of being stabbed in the back or cut on the neck. When Courtney first saw Nelson in the street, Nelson had no shirt and his pants were down about his knees.

On redirect examination, the prosecutor questioned Courtney's report. Courtney again confirmed that Nelson told him he accepted an offer of a ride from someone who tcok him to an apartment.[26] The judge, finding that the subject had been adequately covered, then repeatedly sustained objections to the prosecutor's questions. The prosecutor then rested.[27]

The defense first called Terry Sweeney, who had accompanied Dawson during the early portion of the evening in question. Sweeney and Dawson

[25] Courtney also testified at Dawson's retrial. This testimony as to Nelson's telling Courtney that he was picked up and assaulted by someone offering him a ride on his way home did not come out on Courtney's direct testimony during the prosecution's case in chief, and defense counsel did not attempt to elicit this testimony.

[26] Courtney consistently used the term "apartment," not "house," in relating what Nelson had told him.

[27] In refusing defense counsel's request for a directed verdict, the judge declared, "It's obvious from the record that there has [sic] been some inconsistencies from [sic] the testimony, but that's for the jury to decide."

were acquaintances. That evening they met at a mutual friend's home and then went to Dawson's sister's home, leaving there at 7:15 P.M. On the way to Dawson's house, they passed by the apartment where Nelson was staying. Sweeney had never seen Nelson before. Nelson was standing in the doorway, and he and Dawson began talking. Sweeney said that he and Dawson, after staying for several minutes, went to the convenience store[28] across the street and then returned to the apartment. Sweeney said that they remained there with Nelson for approximately one hour.

Sweeney and Dawson then left Nelson and went to Dawson's house, arriving there around 8:00 P.M. Sweeney stayed for five minutes and then returned to his house to change clothes in preparation for going out with Dawson, Dawson's girl friend, and Dawson's sister later that night. Sweeney returned to Dawson's home between 9:00 and 10:00 P.M. Sweeney said that Dawson was talking with Nelson in the kitchen. Sweeney testified that he went into another room, and that after about fifteen minutes Dawson and Nelson left. Dawson said he would return. Sweeney then went outside and saw Dawson's girl friend coming up the driveway. Sweeney called to Dawson, who was then walking with Nelson along the railroad tracks, to tell him, but apparently Dawson did not hear. Sweeney did not see Nelson walking in front of Dawson. Rather, Sweeney said that Nelson had his arm around Dawson's shoulder. Sweeney waited at Dawson's house for approximately forty-five minutes and then left, leaving a note for Dawson. Sweeney did not see Dawson again that night.[29]

---

[28] Apparently they went to the store to buy beer.

[29] On cross-examination, Sweeney testified that he had seen Dawson just several times "at the store" since that night. Dawson never told Sweeney that he had been arrested, and Sweeney still was not sure

Dawson testified next. Dawson agreed with Sweeney's testimony as to how the evening began. When walking from Dawson's sister's house to Dawson's house, Dawson and Sweeney passed the apartment where Nelson was staying. Nelson was standing in the doorway, began talking to them, and invited them in. Dawson and Sweeney had some beer, and then went across the street to buy some more beer, which they brought back to the apartment. They stayed for approximately one hour, and then Dawson and Sweeney left for Dawson's house. Dawson said that Nelson invited him to return later.

Dawson testified that approximately half an hour after leaving, he returned to the apartment where Nelson was staying. Dawson said that Nelson propositioned him, offering him drinks, marijuana, and money to let Nelson perform oral sex upon Dawson. Dawson agreed.[30] Toni Hramika then returned to the apartment. Dawson said that he and Nelson then went to the convenience store across the street, bought some beer, and at Nelson's suggestion left it at Toni's apartment, so that she would think that he was coming right back.

Dawson said that he and Nelson then walked over to Dawson's house. Sweeney came back and walked into the living room, while Dawson and Nelson stayed in the kitchen. Dawson's housemate was downstairs in the basement with his girl friend. With his housemate and Sweeney present, Dawson testified that he did not see how he and Nelson could complete their deal at Dawson's house. Nelson, however, said that he wanted to do

why Dawson had been arrested. Sweeney could not be specific about exactly when the events to which he had testified took place. It could have been anytime in June or July.

[30] Dawson said that he had been out of work for seven to eight months, was drinking heavily, and needed the money.

"something" that night. Dawson testified that he did not want to return the $37-$40 which Nelson had given him, and agreed to walk Nelson home.

Dawson testified that he and Nelson walked down the railroad tracks to a small park. Nelson suggested that they complete their deal in the park. Dawson assented, and Nelson unzipped Dawson's pants. Dawson said that he was unable to become sexually aroused. Dawson testified that when he told Nelson that they may as well forget the agreement, Nelson stood up and took off running toward his house. Dawson then returned home.

Dawson denied using a knife or making any attempt to force sexual contact. When asked whether he had "ever assaulted anybody in [his] life," Dawson answered no.

On cross-examination, the prosecutor suggested that Dawson had made a number of sexual approaches to other males. Dawson denied attempting to have such "homosexual encounters." One of Dawson's prior jobs had been as a counselor in a juvenile home, and the prosecutor began naming teen-aged boys who had resided at the juvenile home while Dawson was a counselor and asking Dawson if he had not attempted to solicit sexual contact with them.[31] Dawson admitted that he knew the young men but denied soliciting sexual contact. After defense counsel objected to this line of questioning, the prosecutor stated that he would prove that Dawson had made such solicitations.[32]

---

[31] For example, the prosecutor asked, "Isn't it true that you said to Don Allen, 'How about a blow job? You'll get points easier?'" With regard to another former resident, the prosecutor asked, "In fact, you had contact and you said to him something to the effect of, 'You and I could get along a lot better if you gave me some blow jobs.' Isn't that what you said?"

[32] The trial judge ruled that the "similar acts" exception, MRE 404(b), allowed the prosecutor to ask these questions. This question

After a brief redirect examination, Dawson was excused.

The last defense witness was Detective Gay. He testified that had there been visible injuries to Nelson's back or neck, as Nelson had testified, the police department would have photographed them.

The prosecutor then began his rebuttal. The prosecutor sought to introduce evidence supporting his suggestions that Dawson had made a number of sexual approaches to other males. The first witness, Michael Cornell, was a former resident of the juvenile home who had known Dawson. Cornell testified that after he had been placed in a foster home, Dawson visited and took Cornell fishing. He also bought Cornell some rum. Cornell said that when he offered to pay Dawson for the rum, Dawson told him that "you can pay me in another way." Cornell testified that he took this as "faggoty."[33] Cornell did not testify to any further "incidents."

The prosecutor next called Ray Brown, another former juvenile home resident. Brown testified that at one point when he and Dawson were fighting, Dawson "asked me if we could get along better if he gave me a couple blows." When asked how he took Dawson's statement, Brown said "[o]ffensively." "Before I started thinking about it, I was getting angry. It could have meant hit me, it could have meant anything else. I took it angrily and it was over." The prosecutor then attempted to impeach Brown, implying that Brown had earlier stated that Dawson explicitly referred to sexual contact. The judge sustained defense objections to a number of questions. In an ensuing sidebar,

was not briefed on appeal, and we do not in this opinion address the propriety of this use of the "similar acts" exception.

[33] When asked why he took it as "faggoty," Cornell said that that was the only way he saw of taking it.

the judge stated that he would not allow impeachment on a collateral matter.[34]

The prosecutor, noting that it was then 4:30 P.M., requested a recess until the following Tuesday.[35] The judge refused. The prosecutor, stating that he probably had "another three or four hours of direct examination," then began asking Brown questions like "can you tell us the very first day or time it was that you met Mr. Dawson or what that occasion was?" and "How many floors are there in the Juvenile Home please?" Defense counsel objected on relevancy grounds and the judge sustained the objections. After repeated rounds of such questions and sustained objections, the prosecutor asked the following question: "Can you tell us how many times Mr. Dawson offered you a blow job?" Defense counsel objected and moved for a mistrial. The prosecutor, when asked if he had any response, replied "Nope." The court granted the mistrial.

Defense counsel subsequently moved to bar any retrial on the basis of double jeopardy. The prosecutor successfully argued that any such motion

[34] The judge further indicated that he was dissatisfied with the evidence produced by the prosecution to support the suggestions that Dawson had previously solicited sexual contact with other males.

[T]he criteria that must be applied to that evidence when it's brought in to show previous similar acts, the mandates of our Appellate Court decisions require that testimony must be clear, explicit, plain[,] unequivocal, words to that effect. That certainly is not the nature of the testimony thus far both as to this previous incident with Mr. Cornell and both [sic] as to this Witness . . . .

[35] Defense counsel noted that the prosecutor had planned to call three witnesses in rebuttal. As the judge indicated, the two who had already testified had not supported the prosecutor's suggestion that Dawson had solicited male juveniles for sexual contact. Defense counsel noted that the third witness had left the building and obviously did not want to be present. Defense counsel suggested that the request for a recess was simply a delaying tactic.

must be filed and the prosecutor given four days' notice.

Defense counsel filed his motion and argued it the first day of Dawson's retrial.[36] A different judge was presiding. Defense counsel had not requested a transcript of Dawson's original trial, and no such transcript was available.[37] The judge, relying on *People v Benton,* 402 Mich 47; 260 NW2d 77 (1977), denied the motion. The judge read *Benton* as holding that where the defendant "retain[ed] primary control over the course to be followed" in the original trial, double jeopardy would not bar a retrial. The judge found that here the defendant had exercised "primary control" because it was defense counsel who moved for the mistrial.

Dawson was convicted on retrial. The Court of Appeals reversed on the basis of the Double Jeopardy Clause. We affirm the Court of Appeals decision, but adopt a different double jeopardy analysis.

II

The Michigan[38] and federal[39] constitutions provide that no person shall twice be put in jeopardy for the same offense. The purpose of the double jeopardy prohibition is to limit the state to having generally only one attempt at obtaining a conviction. Otherwise, the state could repeatedly prosecute persons for the same crime, transforming the trial process itself into a punishment and effectively punishing the accused without his having been adjudged guilty of an offense meriting punish-

---

[36] March 23, 1982.

[37] The prosecutor argued that the motion was not timely. The prosecutor noted that a jury had already been selected, and that several of the prosecution's witnesses had come from out of state.

[38] Const 1963, art 1, § 15.

[39] US Const, Am V.

ment.[40] Further, because the state can devote its resources to improving the presentation of its case, the probability of a conviction may increase with each retrial. As the United States Supreme Court said in *Green v United States*, 355 US 184, 187-188; 78 S Ct 221; 2 L Ed 2d 199 (1957):

> The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.[41]

An accused is placed in jeopardy as soon as the jury is selected and sworn.[42] Hence, double jeopardy protection attaches before the conclusion of the trial. Where the trial ends before a verdict—where a mistrial is declared—the Double Jeopardy Clause may bar a retrial.

---

[40] [S]ociety's awareness of the heavy personal strain which a criminal trial represents for the individual defendant is manifested in the willingness to limit the Government to a single criminal proceeding to vindicate its very vital interest in enforcement of criminal laws. [*United States v Jorn*, 400 US 470, 479; 91 S Ct 547; 27 L Ed 2d 543 (1971) (plurality opinion).]

[41] For discussion of the policies underlying the Double Jeopardy Clause, see Findlater, *Retrial after a hung jury: The double jeopardy problem*, 129 U Pa L R 701 (1981); Kessler, *Prosecutorial misconduct —No double jeopardy absent an intent to provoke a mistrial*, 12 Golden Gate U L R 115 (1982); Klarman, *Mistrials arising from prosecutorial error: Double jeopardy protection*, 34 Stan L R 1061 (1982); Ponsoldt, *When guilt should be irrelevant: Government overreaching as a bar to reprosecution under the Double Jeopardy Clause after Oregon v Kennedy*, 69 Cornell L R 76, 80-81 (1983).

[42] See n 3 *supra*.

The Double Jeopardy Clause does not bar all retrials. The Supreme Court of the United States has held that the charged offense may be retried where the mistrial was declared because of a hung jury.[43] The Court has fashioned a balancing test focusing on the cause prompting the mistrial.[44] The thrust of the Court's decisions is that the Double Jeopardy Clause does not bar retrial where the prosecutor or judge made an innocent error[45] or where the cause prompting the mistrial was outside their control.[46] Where the motion for mistrial is made by the prosecutor, or by the judge sua sponte, retrial will be allowed if declaration of the mistrial was "manifest[ly] necess[ary]":

> [T]he law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. [*United States v Perez,* 22 US (9 Wheat) 579, 580; 6 L Ed 165 (1824).][47]

---

[43] See *People v Thompson,* 424 Mich 118; 379 NW2d 49 (1985).

[44] See *Oregon v Kennedy,* 456 US 667, 682; 102 S Ct 2083; 72 L Ed 2d 416 (1982) (Stevens, J., concurring) ("The defendant's interest in finality is not confined to final judgments; he also has a protected interest in having his guilt or innocence decided in one proceeding. That interest must be balanced against society's interest in affording the prosecutor one full and fair opportunity to present his evidence to the jury. Our decisions in the mistrial setting accordingly have accommodated the defendant's double jeopardy interests with legitimate prosecutorial interests."); *United States v Jorn,* n 40 *supra,* p 480 ("[I]t becomes readily apparent that a mechanical rule prohibiting retrial whenever circumstances compel the discharge of a jury without the defendant's consent would be too high a price to pay for the added assurance of personal security and freedom from governmental harassment which such a mechanical rule would provide."); *Wade v Hunter,* 336 US 684, 688-690; 69 S Ct 834; 93 L Ed 974 (1949).

[45] See n 4 *supra.* Where a mistrial is declared because of defense counsel's misconduct, the Double Jeopardy Clause will not bar retrial. See *People v Anderson,* 409 Mich 474, 485; 295 NW2d 482 (1980).

[46] See n 5 *supra.*

[47] Where a reviewing court holds that the mistrial was not mani-

Where the motion for mistrial was made by defense counsel, or with his consent, and the mistrial was caused by innocent conduct of the prosecutor or judge, or by factors beyond their control, or by defense counsel himself, retrial is also generally allowed, on the premise that by making or consenting to the motion the defendant waives a double jeopardy claim.[48]

Where a defendant's motion for mistrial is prompted by intentional prosecutorial conduct,[49] however, the defendant may not, by moving for a mistrial, have waived double jeopardy protection. The United States Supreme Court has held that the Double Jeopardy Clause bars retrial where prosecutorial conduct was intended to provoke the defendant into moving for a mistrial. *Oregon v Kennedy,* 456 US 667; 102 S Ct 2083; 72 L Ed 2d 416 (1982).[50]

Justice Powell, who provided the majority's fifth

festly necessary, the double jeopardy prohibition bars retrial. See, e.g., *People v Benton,* 402 Mich 47; 260 NW2d 77 (1977).

[48] See *People v Benton,* n 47 *supra.*

[49] Other courts have held that the apparently intentional or grossly negligent misconduct of other court officials and of the state's witnesses may be attributed to the prosecutor. See, e.g., *State v Rathburn,* 37 Or App 259; 586 P2d 1136 (1978). See also *State v Kennedy,* 295 Or 260, 274-275; 666 P2d 1316 (1983).

[50] The conduct at issue in *Kennedy* was a question asked of an expert witness for the state on redirect examination. Defense counsel, questioning the expert on cross-examination and apparently attempting to establish bias, had asked the witness if he had filed a criminal complaint against the defendant. The witness stated that he had. On redirect examination, when the prosecutor attempted to elicit the reasons why the witness had filed the complaint, the trial judge sustained a series of objections. The Court noted that the Oregon appellate court "later explained that [defendant's] 'objections were not well taken, and the judge's rulings were probably wrong." *Oregon v Kennedy, supra,* 456 US 669, n 1, quoting 49 Or App 415, 417; 619 P2d 948 (1980). The following exchange then occurred:

"*Prosecutor:* Have you ever done business with [defendant]?
"*Witness:* No, I have not.
"*Prosecutor:* Is that because he is a crook?" [*Kennedy,* 456 US 669.]

vote in *Oregon v Kennedy,*[51] wrote in a special concurrence, "[b]ecause 'subjective' intent often may be unknowable," a "court—in considering a double jeopardy motion—should rely primarily on the objective facts and circumstances of the particular case." *Id.,* pp 679-680. Justice Powell did not find intent in *Kennedy* because there was "no sequence of overreaching," because "the prosecutor not only resisted, but also was surprised by, the defendant's motion for a mistrial," and because "the prosecutor testified—and the trial court found as a fact and the appellate court agreed— that there was no 'intention . . . to cause a mistrial." *Id.*

Two state supreme courts, perceiving the wording of the *Kennedy* standard as too narrow, have adopted their own formulations. See *State v Kennedy,* 295 Or 260; 666 P2d 1316 (1983),[52] and *Pool v*

The trial judge then granted defendant's motion for a mistrial, and found that the prosecutor, by asking "Is that because he is a crook?" did not intend to cause a mistrial. The Court did not disturb the trial judge's finding.

[51] While the Court was unanimous in holding that on these facts the federal double jeopardy provision did not bar retrial, four justices disagreed with the majority's analysis, urging instead adoption of a standard that they perceived as providing greater double jeopardy protection.

[52] The Oregon Supreme Court, following remand by the United States Supreme Court, in *State v Kennedy,* 295 Or 260; 666 P2d 1316 (1983), perceived two deficiencies in the federal approach. First, the federal test focused solely on prosecutorial conduct, "[b]ut prosecutors are not the only officials whose conduct may cause a mistrial or a reversal." *Id.,* p 275. Other court officials, such as the bailiff, may be equally guilty of misconduct requiring a mistrial. Second, finding that the prosecutor intended to cause a mistrial means finding that the prosecutor acted in contempt of court and violated professional ethical standards. *Id.* Such a finding may carry consequences for the prosecutor—consequences so severe that judges may attempt to avoid making such a finding. "[This finding] places too heavy a burden on the inference that a defendant must ask a judge to draw from the objective conduct and circumstances." *Id.,* p 276.

Because of these perceived problems the Oregon court adopted a different approach. The Oregon double jeopardy provision bars retrial

## *Superior Court,* 139 Ariz 98; 677 P2d 261 (1984).[53]

> when improper official conduct is so prejudicial to the defendant that it cannot be cured by means short of a mistrial, and if the official knows that the conduct is improper and prejudicial and either intends or is indifferent to the resulting mistrial or reversal. [*Id.*]

Barring retrial in such cases is appropriate, said the Court, because

> [w]hen this occurs, it is clear that the burden of a second trial is not attributable to the defendant's preference for a new trial over completing the trial infected by an error. Rather, it results from the state's readiness, though perhaps not calculated intent, to force the defendant to such a choice. [*Id.*]

Like the United States Supreme Court, the Oregon Supreme Court agreed with the trial judge's finding that the prosecutor's misconduct was not intentional, or made in bad faith, or even grossly negligent. The court affirmed the defendant's conviction on retrial.

[53] The Arizona Supreme Court in *Pool v Superior Court,* 139 Ariz 98; 677 P2d 261 (1984), also adopted a different formulation. *Pool* concerned

> the cumulative effect of a line of questioning in which the prosecutor posed numerous improper questions resulting in at least two bench conferences and one court admonishment. The trial judge granted a mistrial on grounds of improper conduct. [*Pool, supra,* p 106.]

The trial judge found that the prosecutor did not intend to provoke a mistrial.

Reviewing the record, the court held that "[t]he conduct of the prosecutor was egregiously incorrect to the extent that we must infer that the questions were asked with knowledge that they were improper." *Id.,* p 107. The prosecutor could have engaged in improper conduct for several reasons. He may have intended to force the defendant to seek a mistrial, or

> [h]e may have sought to avoid a serious danger of acquittal by using whatever method was available to convict, proper or improper. He may have intended to harass the defendant without thought of the risk of mistrial because of anger at either defendant or defense counsel. He may have simply intended to retaliate for what he perceived as improper conduct of defense counsel, no matter what the risk of mistrial. [*Id.*]

It developed at trial that the prosecutor had mischarged Pool. If Pool moved for a mistrial, "the prosecution could procure a new indictment with correct charges." *Id.* Regardless of the prosecutor's motivation, his conduct violated the double jeopardy prohibition.

III

The Court of Appeals adopted the Arizona test set forth in *Pool, supra. People v Dawson,* 154 Mich App 260, 267; 397 NW2d 277 (1986). The Court of Appeals said that while the prosecutor's conduct at Dawson's original trial did not rise to the "intended to provoke a mistrial" standard of *Oregon v Kennedy, supra,* it did qualify under the *Pool* approach as conduct that the prosecutor "knew [was] improper, and that he [engaged in] with indifference, if not a specific intent, to create unfair prejudice." *Dawson, supra,* p 273.

At oral argument before this Court, counsel for the people conceded that the trial prosecutor's

In such a situation, the State has intentionally exposed the defendant to multiple trials for the same crime and has destroyed his expectation of completing the proceeding before the original tribunal. This is exactly what the double jeopardy provision was intended to prevent. [*Id.,* p 109.]

The court held that Arizona's double jeopardy prohibition barred retrial where the following three conditions were met:

1. Mistrial is granted because of improper conduct or actions by the prosecutor; and
2. such conduct is not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial or reversal; and
3. the conduct causes prejudice to the defendant which cannot be cured by means short of a mistrial. [*Id.,* pp 108-109.]

The court in a footnote stated that the judge was to infer the prosecutor's knowledge and intent from an objective reading of the record. *Id.,* pp 108-109, n 9.

Applying this standard to the case before it, the court inferred, from the "egregiously improper" nature of the prosecutor's conduct at trial, that the prosecutor intentionally engaged in misconduct. The court further inferred that the prosecutor's purpose "was, at best, to avoid the significant danger of acquittal which had arisen, prejudice the jury and obtain a conviction no matter what the danger of mistrial or reversal." *Id.,* p 109. The court held that Arizona's double jeopardy prohibition barred Pool's retrial.

conduct was improper under the *Oregon v Kennedy* standard.[54] The prosecutor urged this Court to follow the *Oregon v Kennedy* standard and to reject the *Pool* formulation adopted by the Court of Appeals. In light of the prosecutor's concession that the trial prosecutor's conduct was improper under the *Oregon v Kennedy* standard, there is no need in the instant case to decide whether this Court should go further than the federal standard.

Retrials are an exception to the general double jeopardy bar. Where a mistrial results from apparently innocent or even negligent[55] prosecutorial error, or from factors beyond his control, the public interest in allowing a retrial outweighs the double jeopardy bar. The balance tilts, however, where the judge finds, on the basis of the "objective facts and circumstances of the particular case," that the prosecutor intended to goad the defendant into moving for a mistrial.[56]

[54] Counsel for the people said:

I think that this is a perfect example of the transcript that you can use and apply the *Kennedy* standard to. . . . I think based on the record that this, if you're ever going to get a record where you can apply the *Kennedy* test this is it.

[55] See *United States v Thomas,* 728 F2d 313, 318 (CA 6, 1984).
[56] See *Oregon v Kennedy, supra,* pp 675-676:

[A] standard that examines the intent of the prosecutor, though certainly not entirely free from practical difficulties, is a manageable standard to apply. It merely calls for the court to make a finding of fact. Inferring the existence or nonexistence of intent from objective facts and circumstances is a familiar process in our criminal justice system. When it is remembered that resolution of double jeopardy questions by state trial courts are reviewable not only within the state court system, but in the federal court system on habeas corpus as well, the desirability of an easily applied principle is apparent.

Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by

IV

Ordinarily a trial judge will determine whether the prosecutor intended to goad the defendant into moving for a mistrial.[57] The judge's findings are subject to appellate review under the "clearly erroneous" standard.[58] In the instant case, counsel for the people conceded during oral argument that the trial prosecutor intended to cause a mistrial. But for such concession, we would remand to the trial court for a factual determination.

The prosecutor's case was going badly. The police had not recovered any evidence from the scene of the crime. The only evidence implicating Dawson was the testimony of Nelson, the complaining witness, who had contradicted himself on at least one crucial matter—first stating that Dawson never said why he wanted Nelson to take off Nelson's pants, and then saying that Dawson said that he wanted to have anal intercourse with Nelson. Nelson's testimony was also confused con-

the Double Jeopardy Clause. A defendant's motion for a mistrial constitutes "a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact." *United States v Scott,* 437 US 82, 93 [98 S Ct 2187; 57 L Ed 2d 65] (1978). Where prosecutorial error even of a degree sufficient to warrant a mistrial has occurred, "[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error." *United States v Dinitz,* [424 US 600, 609; 96 S Ct 1075; 47 L Ed 2d 267 (1976)]. *Only where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.* [Emphasis supplied.]

See also *United States v Sanchez,* 806 F2d 7, 9 (CA 1, 1986); *United States v Posner,* 764 F2d 1535 (CA 11, 1985).

[57] The "goad the defendant into moving for a mistrial" standard "calls for a finding of fact by the court . . . , an inquiry for which the trial court is best suited." *United States v Posner,* n 56 *supra,* p 1539.

[58] MCR 2.613(C); see *Robinson v Wade,* 686 F2d 298, 309 (CA 5, 1982).

cerning the times and events leading up to the alleged assault. One of the state's corroborating witnesses then testified that Nelson had provided him with a completely different account—that he was attacked not near the railroad tracks, but rather in an apartment by a man who offered him a lift home. Nelson's girl friend apparently surprised the prosecutor, and discredited Nelson, by stating that Nelson went with Dawson not to obtain beer, as Nelson had testified, but rather to obtain marijuana.

The testimony of the prosecutor's rebuttal witness did not support the prosecutor's allegations of prior sexual solicitations. The prosecutor's last rebuttal witness left the building before testifying. The prosecutor appeared to be stalling for time, apparently hoping that the court would declare a recess and thereby enable the prosecutor to marshal his forces over the weekend. When a recess appeared unlikely, the prosecutor asked, "Can you tell us how many times Mr. Dawson offered you a blow job?" which he clearly knew was improper. Finally, the prosecutor neither appeared surprised by nor argued against the mistrial motion. When asked whether he had any response to defense counsel's request for a mistrial, the prosecutor responded, "Nope."

We affirm the result arrived at by the Court of Appeals, and hold that Dawson's retrial is barred by the Double Jeopardy Clause.

RILEY, C.J., and BRICKLEY, CAVANAGH, BOYLE, ARCHER, and GRIFFIN, JJ., concurred with LEVIN, J.