# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TYRON JAMAR HUSBAND,

        Defendant-Appellant.

UNPUBLISHED
July 17, 2018

No. 337993
Clinton Circuit Court
LC No. 15-009444-FC

Before: RONAYNE KRAUSE, P.J., and GLEICHER and LETICA, JJ.

PER CURIAM.

Tyron Jamar Husband appeals as of right his jury convictions of second-degree murder, MCL 750.317, armed robbery, MCL 750.529, conspiracy to commit first-degree home invasion, MCL 750.110a(2) and MCL 750.157a(a), first-degree home invasion, MCL 750.110a(2), and three counts of possession of a firearm during the commission of a felony, MCL 750.227b. We affirm.

Husband's convictions arose from a home invasion that led to the shooting death of Jauwan Gaylord Butler on September 18, 2013, in the area of St. Johns, Michigan. The prosecution's theory of the case was that Clifton Bell-Flourry initiated a plan to break into the home of a person known by his girlfriend in search of large sums of money and drugs. Bell-Flourry then persuaded James Spaythe, Joseph Seay, Cody Alvarez, Anthony Dillard, and Husband to carry out the plan, during the course of which Husband fatally shot Butler. Bell-Flourry, Seay, and Alvarez entered guilty pleas in the matter and testified for the prosecution. Spaythe also testified at trial under a grant of immunity.

## I. DOUBLE JEOPARDY

Husband first argues that the constitutional protections against double jeopardy should have prevented the prosecution from retrying him after a mistrial was declared. We disagree.

-1-

The Double Jeopardy Clauses of our federal and state Constitutions[1] prohibit a criminal defendant from being placed twice in jeopardy for a single offense. *People v Booker (After Remand)*, 208 Mich App 163, 172; 527 NW2d 42 (1994), citing *People v Dawson*, 431 Mich 234, 250; 427 NW2d 886 (1988). However, the Double Jeopardy Clauses will not typically serve as a bar to retrial when a defendant requests, or consent to, a mistrial; under those circumstances, the defendant's actions are viewed as having waived a resulting double jeopardy claim. *Dawson*, 431 Mich at 253. On the other hand, "[w]here a mistrial results from apparently innocent or even negligent prosecutorial error, or from factors beyond his control, the public interest in allowing a retrial outweighs the double jeopardy bar." *Id*. at 257 (citation omitted).

Before the first trial, the prosecution stipulated that it would not introduce any evidence that Husband had been previously convicted of offenses involving weapons, had been known to carry a firearm, or had been involved in prior shootings or assaults. But despite the stipulation, the prosecution inadvertently elicited prohibited testimony from Spaythe. Spaythe testified that Husband was carrying a .40-caliber firearm during the incident and that he, Spaythe, heard gunshots he associated with a .40-caliber firearm. The group fled the property, and Spaythe was unsure if anyone had been shot. After Spaythe testified that he learned from a later newscast that someone had died, the following exchange took place:

> *Q*. Did you ever hear anything about this individual [Husband] shooting anybody?
>
> *A*. Not off—not off hand, not until later on down the line.
>
> *Q*. What did you hear?
>
> *A*. That he had shot a few other people.

Defense counsel immediately objected, and a bench conference ensued, after which the trial court instructed the jury to disregard the quoted testimony and excused the jury for the day. Defense counsel then asked for a mistrial, but emphasized that he did not believe that the prosecution's error was intentional. The prosecution similarly explained that the question pertained to what Spaythe had heard concerning the September 2013 shooting and was not designed to prompt inadmissible testimony. The trial court concurred with the parties, stating, "I don't believe that the testimony was deliberately elicited." When proceedings resumed the next day, defense counsel confirmed that he had discussed the matter with Husband and explained to Husband that jeopardy did not bar retrial. According to defense counsel, Husband completely understood that "we would have to have another trial." The trial court stated that it had "no doubt that [the prosecution's] inquiry was not an effort to goad [Husband] into requesting

---

[1] US Const, Am V; Const 1963, art 1, § 15. "The federal provision applies to the states through the Fourteenth Amendment[, US Const, Am XIV]." *People v Dawson*, 431 Mich 234, 236 n 2; 427 NW2d 886 (1988).

mistrial," then concluded, "it is appropriate to grant the request for a mistrial and . . . we will retry this case."

Defense counsel's clear agreement that the prosecution inadvertently elicited the offending testimony obviated the trial court's need to decide whether the prosecution had intended to procure a mistrial. Indeed, counsel's assurance that there was no issue of intentional misconduct and agreement that retrial was proper affirmatively waived any double jeopardy arguments against retrial, thus extinguishing appellate objections. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) ("One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error.") (quotation marks and citation omitted).

Even if this issue had not been affirmatively waived by defense counsel, it would not warrant appellate relief. Unpreserved claims of error are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). In this case, the trial court offered detailed findings and conclusions of its own consistent with the parties' shared position that the prosecution had not intentionally violated the stipulation concerning prohibited evidence. The context of the prosecution's inquiry well supports this conclusion, and the trial court did not plainly err by finding that the prosecution did not act with the intention of provoking Husband's request for a mistrial. As such, the constitutional protections against double jeopardy posed no bar to retrial.

## II. HEARSAY

Husband also argues that he was denied a fair trial because the police investigator, Undersheriff Frederick Sandberg, improperly testified that Bell-Flourry had named Husband as part of the criminal scheme. We disagree.

The decision whether to admit evidence is within the trial court's discretion and is reviewed on appeal for an abuse of discretion. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). As Husband concedes, however, the defense did not object to the challenged testimony, leaving this issue unpreserved for appellate review. *People v Knox*, 469 Mich 502, 508; 674 NW2d 366 (2004). Accordingly, our review is for plain error affecting Husband's substantial rights. *Carines*, 460 Mich at 763. An error is plain if it is clear or obvious, and an error affects substantial rights if it affects the outcome of the proceedings. *Id*. Where plain error is shown, the reviewing court should reverse only when the defendant is actually innocent or the error "seriously affect[ed] the fairness, integrity[,] or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. (quotation marks and citation omitted; first alteration in original).

At the second trial, Sandberg described his investigation of the shooting, including his interviews with Bell-Flourry. Sandberg explained that Bell-Flourry identified four people involved in the crime: Husband, Spaythe, and two people Bell-Flourry knew only as Anthony and Joey. Based upon this information, Sandberg questioned Spaythe, who was incarcerated in Jackson County at the time. On appeal, Husband characterizes Sandberg's testimony relating Bell-Flourry's identification of suspects as inadmissible hearsay. In particular, Husband contends that Sandberg's testimony was inadmissible as a prior consistent statement under MRE

801(d)(1)(B). In passing, he also asserts that the testimony would not qualify for admission under the "catchall" exception of MRE 803(24).

Testimony describing a person's unsworn, out-of-court assertions offered to prove the truth of the matter asserted is referred to as hearsay and is generally inadmissible, subject to several exemptions and exceptions as provided by the rules of evidence. MRE 801 through MRE 804; *People v Musser*, 494 Mich 337, 350; 835 NW2d 319 (2013). Prior consistent statements of a witness appearing at trial are exempted from the definition of hearsay when offered not to prove the matters asserted, but to rebut a charge of recent fabrication. MRE 801(d)(1)(B); *People v Jones*, 240 Mich App 704, 706-707; 613 NW2d 411 (2000). Where the proffered hearsay does not qualify for admission under a specific exception, it may still be admissible under the residual exception set forth in MRE 803(24), which permits admission of hearsay testimony if four requirements are met:

> (1) it must have circumstantial guarantees of trustworthiness equal to the categorical exceptions, (2) it must tend to establish a material fact, (3) it must be the most probative evidence on that fact that the offering party could produce through reasonable efforts, and (4) its admission must serve the interests of justice. [*People v Katt*, 468 Mich 272, 279; 662 NW2d 12 (2003).]

In addition, the proponent of evidence offered under MRE 803(24) must give the opposing party advance notice that the evidence will be introduced. *Id*.

Before asking Sandberg to repeat the names of the individuals implicated by Bell-Flourry, the prosecution asked "what information" was obtained from Bell-Flourry that led Sandberg "to continue down the road with this case[.]" After the names were elicited, the prosecution continued the examination by asking Sandberg what he did with the information. Thus, it appears that the challenged testimony was elicited to explain why Sandberg turned his attention to Husband and Spaythe. Because this testimony was offered to provide context for Sandberg's investigative decisions, rather than to prove the truth of Bell-Flourry's assertions, it is, by definition, not hearsay. *Musser*, 494 Mich at 350. Accordingly, its admissibility does not turn on whether it meets the requirements for admission under MRE 801(d)(1)(B) or MRE 803(24), and Husband's contention that the testimony was improperly admitted under those exceptions lacks merit.

## III. BOLSTERING OF PROSECUTION WITNESSES

Lastly, Husband argues that Sandberg improperly vouched for the credibility of the prosecution's witnesses. Again, because the defense did not object to Sandberg's testimony on this ground, this issue is unpreserved and we review for plain error affecting substantial rights. *Knox*, 469 Mich at 508; *Carines*, 460 Mich at 763.

In the context of explaining the progression of his investigation, Sandberg testified as follows:

> *A.* . . . I think [Spaythe] was probably the most forthcoming on an interview we did [on] July 15[] of 2015 at the Saginaw facility . . . .

*Q.* All right. Now has [sic] Mr. Spaythe's statements to you been even remotely consistent from beginning to end with his interviews?

*A.* No.

*Q.* There are some consistencies however, are there not?

*A.* Well, the big picture always stayed the same for us.

*Q.* And what was the big picture?

*A.* Well, the big picture [w]as that there was this plan to go up to Saint Johns and get into a house and rob a heroin drug dealer for large amounts of cash and or drugs, and things went bad and certain people—right from the beginning—were part of that plan, and—

*Q.* And who were those people that were—

*A.* —at least two guns were mentioned right from the beginning all the way through, so.

*Q.* And who were those people who were part of the plan right from the beginning?

*A.* Mr. Husband, Mr. Spaythe, Cody, and . . . Joey and Anthony.

*Q.* All right. And I assume Mr. Bell-Flourry?

*A.* As the planner . . . .

With respect to his interviews with Alvarez, Sandberg stated that Alvarez "wasn't truthful at first" and initially denied knowledge of the shooting. But according to Sandberg, Alvarez later admitted his involvement and provided further details concerning the incident, though only after negotiating a plea and sentencing agreement. On appeal, Husband contends that this testimony—as well as Sandberg's reference to Bell-Flourry's prior consistent statement—improperly bolstered the witnesses' credibility. We disagree.

"It is generally improper for a witness to comment or provide an opinion on the credibility of another witness, because credibility matters are to be determined by the jury." *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007). However, we cannot conclude on the record before us that Sandberg's statements improperly vouched for the credibility of the prosecution's witnesses. Sandberg unequivocally testified that the details of the events described by Spaythe were inconsistent and that Alvarez was uncooperative until after reaching a plea deal with the prosecution. Under these circumstances, we will not construe Sandberg's statements concerning the varying degrees of cooperation he received from Spaythe and Alvarez as an attempt to improperly bolster their credibility. Indeed, by relating that the witnesses were inconsistent in their statements, Sandberg's testimony discredits Spaythe and Alvarez just as much as it credits them. And for the reasons explained earlier, we infer that Sandberg's

testimony repeating Bell-Flourry's identification of the individuals who executed his plan was elicited for the proper purpose of explaining the course of the investigation.

Further, even if we found error in the challenged testimony, the likely impact of the alleged bolstering was too slight to warrant disturbing the result. *Carines*, 460 Mich at 763 (explaining that third element of plain error review "requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings"). See also *People v Mosko*, 441 Mich 496, 503; 495 NW2d 534 (1992) (a criminal defendant is entitled to a fair trial, not necessarily a perfect one). Sandberg did not explicitly opine regarding the credibility of any of the prosecution's witnesses. To the contrary, he agreed that most of the witnesses provided different statements at various stages of the investigation. At most, the jurors could infer that Sandberg credited some statements made by the witnesses more than others. The impact of such an inference is insignificant when measured against the balance of the evidence presented against Husband. Four coconspirators placed Husband at the scene, armed with a .40-caliber gun, and two individuals incarcerated with Husband testified about his self-implicating discussions with them. Additionally, an expert in firearms and tool marking indicated that the bullets recovered from Butler's body during an autopsy were consistent with either .40-caliber or 10-mm ammunition. Sandberg also discovered during the course of the investigation that a cellphone associated with Husband had received or made outgoing calls using a cellphone tower close to the scene shortly before the shooting occurred. Thus, it is improbable that a minor inference of witness bolstering was outcome determinative.

Moreover, the minimal risk that the jury would improperly rely upon an inference of witness bolstering was further alleviated by the trial court's final instructions. Importantly, "[j]urors are presumed to follow instructions, and instructions are presumed to cure most errors." *People v Petri*, 279 Mich App 407, 414; 760 NW2d 882 (2008). Here, the trial court clearly instructed the jury that it was responsible for determining issues of credibility and identified appropriate factors to be considered in evaluating witness credibility. The trial court also provided an additional cautionary instruction concerning the testimony offered by Bell-Flourry, Spaythe, and Alvarez:

> You should examine an accomplice's testimony closely and be very careful about accepting it. You may think about whether the accomplice's testimony is supported by other evidence, because then it may be more reliable. . . . When you decide whether you believe an accomplice, consider the following: Was the accomplice's testimony falsely slanted to make the Defendant seem guilty because of the . . . accomplice's own interests, biases, or for some other reason? Has the accomplice been offered a reward or been promised anything that might lead him to give false testimony? . . . In general, you should consider an accomplice's testimony more cautiously than you would of an ordinary witness. You should be sure you have examined it closely before you base a conviction on it.

The trial court thus instructed the jury that it was solely responsible for determining the facts, including the credibility of the witnesses, and to apply special scrutiny to the testimony of accomplices. The trial court's instructions were sufficient to protect Husband's substantial rights.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Elizabeth L. Gleicher
/s/ Anica Letica