*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

GERALD BENNETT,

        Defendant-Appellee.

UNPUBLISHED
February 24, 2022

No. 358060
Kent Circuit Court
LC Nos. 18-003289-FC; 18-
        005253-FC

Before: BORRELLO, P.J., and M. J. KELLY and REDFORD, JJ.

PER CURIAM.

The prosecution appeals by delayed leave granted[1] the trial court's order finding that defendant was not competent to stand trial and that there was not a substantial probability that he would attain competency with treatment within 15 months. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

Defendant was charged with both conspiracy to commit first-degree murder[2] and perjury during an examination conducted pursuant to an investigative subpoena involving a criminal matter.[3] After defendant was bound over to the circuit court, he was evaluated for his competency to stand trial. Defendant was examined by Dr. Jennifer Whitmore, Dr. Elissa Benedek, and Dr. Daniel Mayman.

Whitmore, a psychologist employed by the Center for Forensic Psychiatry, met with defendant three times as part of her evaluation. Over the course of these meetings, Whitmore

---

[1] *People v Bennett*, unpublished order of the Court of Appeals, entered October 29, 2021 (Docket No. 358060).

[2] MCL 750.316; MCL 750.157a.

[3] MCL 767A.9(1)(b).

administered a series of psychological tests to defendant measuring his cognitive ability, his intellectual functioning, whether he was feigning or malingering with respect to cognitive functioning, his ability to learn and remember verbal information, vocabulary, and memory function. She concluded in her report that defendant had a significant cognitive impairment, an extremely low IQ, below average verbal abilities, a poor memory, poor literacy, and difficulties with learning, retaining, and understanding information. She also concluded from testing that defendant was exerting optimum effort and not feigning cognitive impairment. Defendant could not correctly recite the alphabet. According to Whitmore, defendant reported that he had never lived independently and could not cook or shop for himself. He claimed to rely on others to cook for him because he only knew how to microwave "junk" food.

Additionally, Whitmore determined through discussions with defendant that he had substantial deficits in his basic knowledge of the functions of courtroom personnel, including the judge, prosecutor, and defense attorney. At one point, defendant made statements referring to the prosecutor as "my attorney" and expressing a belief that the prosecutor was trying to get him to assist her.

Whitmore attempted to discuss defendant's charges with him on multiple occasions. Although defendant had described perjury as lying to the police at one earlier meeting, he later described it simply as lying and indicated his belief that Whitmore could be convicted of perjury for lying to her husband. Defendant explained that Whitmore was not in jail because her husband had not pressed charges. Defendant also had apparent difficulty understanding the nature of an oath. Whitmore reported that defendant had described his conspiracy charge as "me plotting with somebody to do something wrong, to get rid of a body." However, defendant explained further that he felt " 'hurt and disrespected' attributable to people believing he had 'done something to a female child.' " Whitmore concluded that defendant "had little to no appreciation of the social perception or seriousness of his current charges." Defendant admitted that he attended a preliminary examination but, upon further discussion, appeared unable to demonstrate an understanding of the event or what the term meant.

Whitmore opined in conclusion that defendant was not competent to stand trial under the standard in MCL 330.2020 and that there was not a substantial probability that he could attain competency with treatment within 15 months. Whitmore specifically opined that defendant was not competent to stand trial at the time of the evaluation because defendant was unable to understand the nature of the proceedings against him or to rationally assist his defense due to his mental condition. Whitmore explained:

> Mr. Bennett's history and current presentation are consistent with intellectual disability; he shows significantly subaverage intellectual functioning and there are multiple references to his impaired adaptive limitations over time. During the course of this evaluation, Mr. Bennett appeared incapable of understanding the nature of the proceedings against him. He showed poor ability to understand the crux of his charges or to appreciate his charges in the social/legal scheme. Despite his ability to intermittently respond to posed legal questions with correct responses, this was not consistent over the course of the evaluation sessions. If the same question was posed to Mr. Bennett on multiple occasions, he responded with differing answers - some of which were accurate and some of which were

inaccurate. Mr. Bennett additionally showed poor emotional control; he frequently and easily became tearful, particularly when becoming cognitively overwhelmed with legal information. His history and current presentation suggest naivete and suggestibility - two common features associated with intellectual disability. Although he discusses his intention to follow his attorney's advice, it appears he does not enact his intentions and, instead, inappropriately discusses his case and seeks legal advice from other inmates, which appears particularly ill-advised given the nature and context of his legal situation. His ability to provide relevant historical information appears impaired; he shows little to no ability to provide an accurate accounting of his previous diagnoses or treatment providers. Similarly, he appears to have limited ability to understand and/or discuss the intentions or motives of others in a sophisticated manner, which I further attributed to his intellectual disability. Finally, Mr. Bennett exhibits an overlay of inconsistent interactional styles that further complicate his fitness to proceed; he vacillates from an inappropriate bravado, to paranoia, to significant feelings of hopelessness attributable to his cancer diagnosis. These factors, along with potential complicating cognitive effects of chemotherapy, are significant in understanding Mr. Bennett's complete forensic/clinical picture. Taken together, these observations suggest Mr. Bennett would have marked difficulties appropriately and rationally assisting in his own defense. Based available [sic] data, it is my opinion that Mr. Bennett, at the time of this evaluation, was incompetent to stand trial.

Next, with respect to the likelihood that defendant would obtain competency if provided a course of treatment, Whitmore referenced available research studies indicating that treatment was less likely to be effective in helping individuals with intellectual disability to attain competency than it was in helping individuals with treatable mental illnesses "because intellectual disability is a lifelong cognitive deficiency that does not respond to traditional psychiatric treatments and has a poor prognosis for meaningful change." Whitmore concluded:

[I]t is my opinion that the weight of available data suggest that Mr. Bennett is not likely to attain the requisite knowledge and skills to be considered competent to stand trial on the current charges, even if provided with a mandated course of competency restoration treatment/training. First and foremost, Mr. Bennett has a longstanding history and presentation consistent with intellectual disability; he will consistently demonstrate significantly subaverage thinking and reasoning skills, despite any course of available intervention. Several pieces of data suggest that he benefits minimally from outside sources of influence: despite a long history of criminal justice involvement, he continues to show very poor knowledge of basic legal information; despite repeated focused education over the course of this evaluation, he showed minimal ability to consistently and accurately recall provided information; despite training, he reportedly continued to show deficits in his ability to perform basic, everyday tasks. Importantly, Mr. Bennett's current charges are patently abstract in nature. Both perjury and conspiracy are based upon abstract constructs that only assume criminal status based on their social context. Consistent with a diagnosis of intellectual disability, Mr. Bennett views and understands the world in a concrete nature; no amount of education or training is likely to allow him to fully understand abstract social constructs. Thus, I believe

Mr. Bennett's cognitive impairment will prevent him from ever having a full appreciation of the crux of his current charges and, subsequently, it is unlikely he will be able to meaningfully participate in the criminal defense process.

Recognizing the difficulties inherent in estimating the likelihood of an individual attaining competency to stand trial in the future, it is my opinion that, based on available research and clinical data, Mr. Bennett would be unlikely to acquire, via a course of treatment, the legally-relevant knowledge and skills required for him to be determined competent to stand trial. I respectfully acknowledge that the ultimate decisions in these matters depend upon judicial determinations.

Defendant was subsequently evaluated by Benedek, who is a psychiatrist, after the prosecutor requested a second opinion. Benedek reviewed the testing administered by Whitmore and also conducted her own personal examination of defendant. Based on defendant's behavior and interview with Benedek, she similarly concluded that defendant had a mild to moderate intellectual disability. Nonetheless, Benedek opined that defendant was competent to stand trial under MCL 330.2020 because he understood the nature and object of the proceedings against him and could rationally assist his defense. In support of this conclusion, Benedek cited information gleaned from her record review and examination of defendant. Benedek reasoned that defendant had been able to "succeed in a life on the streets," despite his mental limitations and impairments, by selling drugs, doing odd jobs, and collecting Social Security. Benedek noted defendant's reported knowledge of drug prices on the streets of Detroit and Grand Rapids. She further explained that defendant spent a great deal of time during the examination insisting that he was innocent of the charges and describing his version of events. Benedek concluded that defendant understood the nature of the perjury and conspiracy charges: she noted that defendant equated perjury with lying in court or courtroom, which he denied doing, and that defendant understood his conspiracy charge to based on an allegation that he helped dispose of a body. Benedek also concluded that defendant could correctly explain the role of the personnel in the courtroom even if he first gave an incorrect explanation. Benedek gave weight to defendant's long history of involvement with the criminal justice system and his demonstrated ability to "survive in prison."

Finally, defendant was additionally evaluated by Mayman, who is also a psychiatrist. Mayman opined that defendant was not competent to stand trial at the time of the evaluation because defendant's mental impairment caused him to have an "inadequate understanding of the nature and object of the proceedings against him" and an inability to rationally assist his defense. However, Mayman was somewhat equivocal about defendant's ability to obtain competency. Mayman opined:

It is possible that, with appropriate training, he could achieve an adequate understanding of the nature and object of the proceedings against him, but it appears unlikely that his ability to rationally assist in his defense could be restored in the time allowed by statute. However, this is difficult to predict and an admission to the Center of Forensic Psychiatry for restoration of competency may be appropriate.

Mayman also stated in his report that he found Whitmore's evaluation "extremely rigorous" and that most of the tests administered by Whitmore "must be conducted by testing psychologists and are outside of the scope of practice for psychiatrists such as Drs. Benedek and Mayman." Mayman described his discussion with defendant regarding relevant legal concepts, including the nature of the charges and the roles of courtroom personnel, and Mayman explained that defendant "would often give different answers to the same question at different points during the interview" and "could be led to correct responses but moments later could not arrive at them on his own." According to Mayman:

> After spending quite some time discussing Mr. Bennett's knowledge of the legal proceedings, it became quite apparent that he was significantly lacking a rational understanding of his charges as well as in his ability to rationally assist in his defense. He would regularly provide contradictory information, apparently unaware of any contradiction. One example was noted in the previous section when Mr. Bennett said that he would like to act as his own attorney. Immediately after I reminded him that he cannot read and understand the legal materials, he said that he wished he had spent more time in the law library in prison. This was one of many times that it appeared that Mr. Bennett did not comprehend the seriousness of his intellectual limitations.

In explaining his final opinion that defendant was not competent to stand trial, Mayman noted that it was undisputed that defendant suffered from a significant intellectual impairment but the issue was whether that impairment impacted his competency to stand trial. Mayman disagreed with Benedek's assessment that defendant had been able to succeed on the streets, observing that defendant had spent the majority of his adult life incarcerated or homeless. Mayman also noted that defendant tended to fill in memory gaps with fabricated information that he believed to be true rather than admitting that he did not know something, which Mayman called "confabulat[ing]," and that defendant had adopted a survival strategy of attempting to appear more "intellectually capable" than he is.

The trial court conducted a two-day evidentiary hearing on defendant's competency. Whitmore, Mayman, and Benedek testified as experts at the hearing regarding their evaluations of defendant and their opinions regarding his competency. Their opinion testimony was consistent with their respective written reports, summarized above.

Whitmore testified that she met with defendant for a total of approximately seven hours, over the course of three separate meetings. She also explained that opinions regarding competence to stand trial are often based on an interview without the aid of standardized psychological tests but that if such tests are used to obtain additional information, the tests must be administered by someone trained in psychology. She further explained that psychological testing could be used as part of a competency evaluation and that "part of psychologists' training is how to administer and interpret psychological testing." Whitmore testified, "It's rare to say that someone's permanently incompetent to stand trial."

Mayman also provided testimony regarding the differences between evaluations conducted by psychologists and psychiatrists and how those differences were relevant in the instant case:

[D]efendants can be evaluated by either a Ph.D. or an M.D., and they probably, you know, have the same, you know, overlapping skills in many cases.

You know, in this particular case, when the question of low intelligence is -- is part of the evaluation, Ph.D. psychologists have a bit of an advantage because they are the ones that are actually able to do -- some of them are actually able to do things like intelligence testing. They also can do the more complex psychological tests like, you know, in this case, Dr. Whitmore did the TOMM, the Test of Malingered Memory -- Memory Malingering, which his kind of a gold-standard test to look at whether somebody's, you know, intentionally producing symptoms or not. So, I think in this case, it's actually -- I -- I relied a fair amount on Dr. Whitmore as a Ph.D. to get all of the -- those testing results.

Benedek disagreed that psychologists were superior to psychiatrists in assessing cognitive functioning, testifying that "[w]e assess in different ways." She explained:

Psychologists have standard tests that they administer, and we -- and they use that testing. We use our clinical impressions of what someone's intellectual ability is. And then -- and if you look at the DSM, which is the current diagnostic manual in psychiatry, there are three ways that you look at issues. One is conceptual domain. That's cognitive that we were talking about. Second is social domain, and that is interaction with others. And, third, is practical domain.

And so, we assess not on the basis of testing, but interaction -- someone's use of language, someone's use -- use of language, ability to create sentences, to explain things. We intellect -- assess intellectual domain.

Social domain, how does somebody get along in the world? Do they have friends? Do they have family? Do they have social interactions? How do they get along if they're in prison with other prisoners, or on the street, or with their family, or in school? Social domain. Look at a variety of ways.

And then practical domain, how do they get along on the street, or in their homes, or in their communities.

And so, we assess on three areas of -- and that's the contemporary way of thinking about abilities.

The prosecution also called two lay witnesses: defendant's former girlfriend and a detective who took part in questioning defendant at the investigative-subpoena hearing. Defendant's former girlfriend testified that defendant managed his own money, could cook, and could read. The detective testified that defendant seemed to understand his rights and the nature of the investigation during the investigative subpoena.

Following the evidentiary hearing, the trial court issued a written opinion and order concluding that defendant had established by a preponderance of the evidence that he was not

competent to stand trial and that there was not a substantial probability that he would obtain competency within 15 months.

In making its competency determination, the trial court assessed the credibility of the experts and found Whitmore's opinions most credible. The trial court primarily adopted her reasoning as supported, in some respects, by Mayman's opinions. In concluding that Whitmore was most credible, the trial court found it significant that Whitmore was an independent expert, that she spent more time interviewing defendant than Benedek, that she was a psychologist with an opinion that was supported by psychological testing regarding intellectual functioning and malingering that she was trained to administer and that psychiatrists were not trained to perform, and that she had performed the greatest number of competency evaluations of the testifying experts. The trial court also found Mayman's opinion—that a psychologist was in a superior position to a psychiatrist to offer an opinion in this case involving intellectual disability because of the qualifications required to administer relevant psychological testing—more credible than Benedek's opinion on that issue.

The trial court found "Whitmore's testimony credible that Defendant is incapable of understanding the nature and object of the proceedings against him" because defendant "showed a poor ability to understand the crux of the charges against him or appreciate the charges in the social/legal scheme" and was unable because of his intellectual disability and memory deficits to fully understand "basic legal information or the abstract nature of the crimes he is charged with committing" even though he could intermittently provide appropriate responses to questions. The trial court also found that Whitmore's opinions were bolstered by Mayman's opinion based on his interview and record review that defendant was not capable of understanding the nature and object of the proceedings against him due to his intellectual and memory deficits. The trial court found that Mayman's testimony regarding defendant's competency was more credible than Benedek's opinion that defendant's ability to function and "street smarts" showed that he was competent. The trial court found the lay witness testimony to be of little or no probative value in addressing the statutory criteria for competence.

With respect to whether defendant could rationally assist in his defense, the trial court stated:

> In deciding whether Defendant is capable of assisting in his defense in a rational manner, the Court must determine Defendant's ability to perform the tasks reasonably necessary for him to perform in the preparation of his defense and during his trial. MCL 330.2020(1).
>
> The Court finds that Defendant has sustained his burden of proof on this issue. For the reason noted in Section II above [regarding whether defendant was incapable of understanding the nature and object of the proceedings against him], the Court finds the opinions of Drs. Whitmore and Mayman more credible than the opinions of Dr. Benedek on this issue. Defendant has cognitive and memory deficits which prevent him from assisting in his defense. Moreover, as Dr. Mayman opined, Defendant has a tendency to confabulate, which would cause significant difficulties in preparing his defense and assisting his attorney at trial.

Further, the Court finds that Dr. Benedek's opinions that Defendant is competent based on "street smarts" is simply not credible. There is no question that the Defendant does have some limited functional ability. However, testing concerning his cognitive functioning and memory make him incapable of rationally assisting in his defense based on the credible testimony of Drs. Whitmore and Mayman.

Finally, as outlined in Section II above, the Court finds that the lay witness testimony submitted has little to no probative value on this issue.

Next, with respect to whether there was a substantial probability that defendant could attain competency within 15 months if provided treatment, the trial court also found Whitmore's opinion on this issue credible for the court's previously discussed reasons. The trial court concluded:

Defendant is permanently incompetent to stand trial. Due to his cognitive deficits and memory problems, attempts to educate or train the Defendant to make him competent would not be fruitful. He simply does not have the intellectual functioning or memory skills to retain the information he would need to attain competency.

The prosecutor moved for reconsideration, which the trial court denied. The prosecutor now appeals by delayed leave granted.

## II. STANDARD OF REVIEW

This Court reviews a court's decision on a defendant's competence to stand trial for an abuse of discretion. *People v Harris*, 185 Mich App 100, 102; 460 NW2d 239 (1990). "[A]n abuse of discretion occurs only when the trial court's decision is outside the range of reasonable and principled outcomes." *People v Kammeraad*, 307 Mich App 98, 140; 858 NW2d 490 (2014) (citation and quotation marks omitted; alternation in original).

"In Michigan, the competence of criminal defendants to stand trial is governed by provisions of the Mental Health Code. MCL 330.2020 *et seq*." *People v Davis*, 310 Mich App 276, 288; 871 NW2d 392 (2015). The trial court is empowered in MCL 330.2020(1) to determine whether a criminal defendant is incompetent to stand trial pursuant to the standards provided in that statutory provision. *Davis*, 310 Mich App at 288, 293. The trial court's competency determination under MCL 330.2020(1) "as with any judicial decision, must be based in fact." *Davis*, 310 Mich App at 293. "The judgment of a defendant's competence and 'whether there is a substantial probability that the defendant' could attain competence must be based on 'the evidence admitted at the hearing . . . .' " *Id*., quoting MCL 330.2030(2) (ellipsis in original).

"A trial court's findings of fact may not be set aside unless they are clearly erroneous." *People v Bylsma*, 493 Mich 17, 26; 825 NW2d 543 (2012), citing MCR 2.613(C) and *People v Dawson*, 431 Mich 234, 258; 427 NW2d 886 (1988). "A ruling is clearly erroneous if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *Bylsma*, 493 Mich at 26 (quotation marks and citation omitted). When reviewing the trial court's factual findings for clear error, "regard shall be given to the special opportunity of the trial court

to judge the credibility of the witnesses who appeared before it." MCR 2.613(C). To the extent issues of statutory interpretation are involved, our review is de novo. *Davis*, 310 Mich App at 286.

## III. ANALYSIS

Pursuant to MCL 330.2020(1),

> A defendant to a criminal charge shall be presumed competent to stand trial. He shall be determined incompetent to stand trial only if he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner. The court shall determine the capacity of a defendant to assist in his defense by his ability to perform the tasks reasonably necessary for him to perform in the preparation of his defense and during his trial.

Additionally, MCL 330.2030(2) provides:

> On the basis of the evidence admitted at the hearing, the court shall determine the issue of the incompetence of the defendant to stand trial. If the defendant is determined incompetent to stand trial, the court shall also determine whether there is a substantial probability that the defendant, if provided a course of treatment, will attain competence to stand trial within the time limit established by section 1034.[4]

"A defendant who is determined incompetent to stand trial shall not be proceeded against while he is incompetent." MCL 330.2022(1).

> If the defendant is determined incompetent to stand trial, and if the court determines that there is not a substantial probability that, if provided a course of treatment, he will attain competence to stand trial within the time limit established by section 1034, the court may direct a prosecuting attorney to file a petition asserting that the defendant is a person requiring treatment as defined by section 401 or meets the criteria for judicial admission as defined by section 515 with the probate court of the defendant's county of residence. [MCL 330.2031.]

Here, the trial court was presented with conflicting expert opinions and the trial court's well-reasoned decision rested on its factual findings resulting from its resolution of the conflicting evidence, its weighing of the evidence, and its credibility determinations. Such matters are generally entitled to deference on appeal. MCR 2.613(C); *Kammeraad*, 307 Mich App at 141. Our review of the record does not leave us with a definite and firm conviction that a mistake was made, and we therefore do not conclude that the trial court's factual findings were clearly erroneous. *Bylsma*, 493 Mich at 26. The trial court's ruling on defendant's competency was not an abuse of discretion. *Harris*, 185 Mich App at 102.

---

[4] The parties do not dispute that this period is 15 months under the circumstances of this case.

Nonetheless, the prosecution argues that "the trial court abused its discretion in applying these legal principles to the case at hand." More specifically, the prosecution argues that "the trial court's reliance on Dr. Whitmore's opinion was clearly erroneous in light of the evidence" and that "the evidence demonstrated Defendant's competence to stand trial when applying the proper legal standard." The prosecution further contends that "the trial court's reliance on Dr. Whitmore's testimony and report was clearly erroneous given that Dr. Whitmore applied an improper, heightened standard of competency throughout her evaluation." In the alternative, the prosecution argues that the trial court should have at least found that defendant could have obtained competency within 15 months if provided treatment.

Contrary to the prosecution's assertions regarding the standard employed by Whitmore, Whitmore specifically cited and quoted MCL 330.2020(1) in her report, and her opinions are based on MCL 330.2020(1). Accordingly, the record evidence demonstrates that Whitmore was aware of, and relied on, the proper legal standard in forming her expert opinion. The trial court also relied on the proper legal standard in making its competency determination, referencing language from MCL 330.2020(1).

Moreover, although the prosecution characterizes its appellate argument as a challenge to the legal standard employed by Whitmore and, by extension, the trial court in relying on Whitmore's opinions, we recognize the prosecution's argument as a challenge to the validity and weight that should have been afforded Whitmore's opinions. The prosecution argues that Whitmore expected too much in terms of defendant's mental capacity in reaching her opinions regarding defendant's competency. The prosecution also points to what it views as factual inconsistencies or illogical reasoning in Whitmore's analysis that the prosecution views as undermining Whitmore's opinions and conclusions.

The prosecution strenuously maintains that the trial court should have disregarded Whitmore's opinion and, at least implies, that the trial court should have agreed with Benedek's opinions. But these arguments are actually directed at the propriety of the trial court's factual findings in resolving the conflicting opinions of two experts, both of whom the prosecution admits were qualified to render these opinions. As we have already explained, the trial court's findings were not clearly erroneous. We therefore reject the prosecution's arguments.

Affirmed.

/s/ Stephen L. Borrello
/s/ Michael J. Kelly
/s/ James Robert Redford