*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
February 1, 2024

Plaintiff-Appellee,

v

No. 365018
Genesee Circuit Court

MARQUON LEON JACKSON,

LC No. 22-049711-FC

Defendant-Appellant.

Before: HOOD, P.J., and REDFORD and MALDONADO, JJ.

PER CURIAM.

Defendant appeals by interlocutory leave granted[1] an amended order denying his motion to dismiss the criminal charges of open murder, MCL 750.316, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227(b), after the court declared a mistrial based upon a question defense counsel asked a prosecution witness during cross-examination. We affirm.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY
### A. UNDERLYING INCIDENT

This case arises from the shooting death of Mozzaffer Khogaly outside a gas station convenience store in the early morning hours of March 15, 2022.[2] Khogaly parked his vehicle parallel to the sidewalk just outside the entrance to the store and left the vehicle running with the driver's door open. Khogaly entered slowly into the store, ducked behind the soda machine, opened a package of pistachios, and began eating them. The store's clerk confronted Khogaly that

---

[1] *People v Jackson*, unpublished order of the Court of Appeals, entered April 26, 2023 (Docket No. 365018).

[2] The facts are taken primarily from the transcript of defendant's preliminary examination.

he needed to pay for the nuts, but Khogaly refused and told the clerk that she would have to call the police to get him to leave. The clerk called 911 and Khogaly began throwing pistachios at her.

While Khogaly stood near the counter, defendant entered the store, selected some items to purchase, and went to the counter to pay for them. The clerk testified that Khogaly threw a handful of pistachios at defendant. When defendant stepped sideways and said, "[E]xcuse me," Khogaly said that he meant to throw the pistachios at "the bitch." Khogaly then said, "[W]e can make it for you," and reached over to grab defendant. Defendant backed away, told Khogaly not to touch him, and showed Khogaly his pistol in a holster on his hip. The clerk testified that Khogaly stepped toward defendant, who stepped backward and told Khogaly to stay back. Defendant then drew his gun, and the clerk again called 911. At that point, defendant noticed that he had left his wallet on the counter and asked the clerk to retrieve it. The clerk testified that Khogaly reached for the wallet and tried unsuccessfully to grab the clerk's arm as she picked up the wallet. Khogaly stepped toward defendant and "started with him again." Defendant continued walking backward with his gun drawn while telling Khogaly to "stop, just leave." Khogaly kept walking toward defendant despite the fact that defendant had his gun drawn. Defendant left the store, and Khogaly followed defendant out and stood next to his vehicle's open driver's door, then walked toward defendant. The clerk testified that Khogaly then said, "I got you," and reached into his vehicle as if he were going to grab something. The clerk saw defendant "get scared," and she described the reaction on his face as "oh, shit, I'm going to die if I don't shoot." Defendant fired multiple shots, "shooting around trying to get him to stop," before defendant ran off.

At the preliminary examination the court admitted surveillance video from a camera inside and a camera outside the store.[3] The video from inside of the store is consistent with the clerk's testimony. This video reveals that defendant paid for his items with a credit card, and while trying to replace his card in his wallet, Khogaly tossed some pistachios at defendant. Defendant laid his wallet on the counter and turned toward Khogaly. Khogaly responded by lunging at defendant and appeared to attempt to grab him. Defendant backed away, leaving his wallet open on the counter. Defendant revealed that he had a holstered handgun. Khogaly advanced a step toward defendant. Defendant drew his gun with his right hand and pointed it at the floor. Defendant pointed toward the door with his left hand. Defendant retreated behind the beverage dispenser island placing it between him and Khogaly. Defendant spoke with the clerk who stepped to the counter and retrieved defendant's wallet. As she did so, Khogaly attempted to grab the wallet. The clerk stepped to the counter and took defendant's wallet as Khogaly tried to take possession of it. The clerk backed away from the counter and held defendant's wallet while she used her cell phone to make a call. Another customer came into the store and noticed the situation and fled out the store. Defendant followed behind her but stopped in the open doorway. Meanwhile, the clerk had defendant's wallet. Defendant stepped back inside the door with gun drawn and pointed at Khogaly who stood between defendant and the clerk. Defendant exited the store and retreated when Khogaly followed him outside and stood by his car adjacent to the store's doorway. Defendant stepped up to the sidewalk by the store windows and took a step toward the door. Defendant had his gun pointed toward Khogaly who stood by the door. Khogaly then advanced toward defendant, then stood still. Khogaly then gestured to defendant with a dismissive wave of

---

[3] The surveillance videos do not feature audio.

-2-

his hand, turned, and stepped toward his open car door. The record does not contain further footage from the camera inside the store.

The video from outside the store shows a female patron fleeing the store and returning to her car. Defendant exited the store backward with gun drawn pointed at Khogaly who followed defendant out of the store. Khogaly walked to his open car door, stopped, turned toward defendant, walked to the store entrance, then advanced toward defendant. Defendant kept his gun pointed at Khogaly. Khogaly took a couple steps toward defendant who held his gun in both hands and pointed at Khogaly. Khogaly gestured toward defendant with a dismissive wave, turned and stepped toward his open car door, then stopped and turned back toward defendant. Khogaly appears to make a statement to defendant who took a step forward. Khogaly made further remarks to defendant who then stepped backward. Khogaly stepped toward defendant, then backed up and stopped. Khogaly then went to his open car door while talking to defendant and reached into the car as defendant came a couple steps closer. As Khogaly reached into his car, defendant opened fire. Defendant then ran sideways from the scene looking in Khogaly's direction and continued to point his gun in that direction.

An officer dispatched to the location approached the scene with the dashcam recording. The officer noticed a person walking across the street on the sidewalk approaching with his hands in the air. Defendant surrendered to the police who took him into custody. The dashcam video recorded the arrest and later featured conversation between law enforcement officers.

Three days before trial, the prosecution provided defense counsel a dashcam video recording from a police cruiser that responded to the scene. The dashcam video recorded defendant's arrest and several minutes after that an officer can be heard stating: "I just ran the victim. He's . . . flagged as being part of a possible terrorist organization." The record does not reflect that the prosecution moved in limine to prevent or limit the defense's introduction of any portion of that dashcam video.

## B. PROSECUTION'S MOTION FOR A MISTRIAL

At trial, the court admitted the two store surveillance videos as part of the prosecution's case-in-chief. The videos were viewed by the jury.

The prosecution called Khogaly's cousin, Ibrahim Elsayed, as a witness. Elsayed testified that he lived in North Carolina and was talking on the phone with Khogaly at approximately 12:30 a.m. on March 15, 2022. Khogaly told Elsayed to wait for him. Elsayed testified that after waiting four or five minutes, he heard Khogaly arguing with another man. Elsayed heard the other man repeatedly say, "I'm going to shoot you." Elsayed testified that he kept calling Khogaly's name and heard "somebody tell him like I'm going to shoot, I'm going to kill you and then just do it." He heard Khogaly keep telling the man, "just do it. If you want to do it, do it." Elsayed then heard a few gunshots. He heard Khogaly say "he shot me."

During cross-examination, Elsayed admitted that he did not know what had transpired inside the store. Elsayed admitted that he did not call the police on March 15, 2022, and first gave his statement to the police in June. He testified that he knew Khogaly well. Defense counsel then

asked, "You know that he's a member of a terrorist organization—." The prosecution objected and the trial court directed Elsayed not to answer.

The trial court held a bench conference and ordered the jury and spectators to leave the courtroom. The court heard arguments from counsel on the admissibility of the evidence pursuant to MRE 404(a)(2). The prosecution argued that the evidence was more prejudicial than probative and that no evidence demonstrated aggression by Khogaly. The prosecution asserted that the question served no purpose except to inflame the jury's passion against Khogaly by painting him as a terrorist. Defense counsel argued that evidence of Khogaly's membership in a terrorist organization had relevance to determining whether he had a character for aggression. Defense counsel also argued that he could ask the witness the question and the witness could answer that Khogaly was not a terrorist. He asserted that it would be important for the jury to hear the testimony, particularly in this case in which defendant relied on a theory of self-defense to defend himself. Defense counsel pointed out that the jury should hear such evidence where someone tried to intimidate and harass defendant, because Khogaly's character for aggression was at issue in this case. The prosecution responded that, even if evidence existed that defendant was a terrorist, that alone would not be evidence of a character for aggression. The prosecution argued that the questioning of the witness tainted the jury by inflaming the members' biases.

The trial court found the question to be a close call but ultimately ruled that defense counsel would be allowed to ask Elsayed if he was aware of "any acts of aggression, violence, intimidation, and so forth" by Khogaly, but that the reference to the word terrorist went too far and should be avoided. The prosecution responded that then it should be permitted to present evidence of defendant's character. Defense counsel informed the court that it would withdraw the question and stated that the court could cure any issue with an instruction to the jury. The prosecution responded that defense counsel could not "unring the bell" and that a curative instruction would not be adequate to cure the prejudice of the reference to Khogaly as a terrorist. The prosecution suggested that a mistrial might be required to cure the problem. The court reflected upon the question asked by defense counsel and noted that evidence of the victim's character had not been admitted and that consequently the prosecution could not offer any evidence of the character for aggression of the accused. The trial court indicated that it would rely upon a curative jury instruction. The prosecution placed an objection to the court's ruling and argued that it should be permitted to offer evidence of the character of the accused. When the jury returned, the court instructed the jury to disregard the question asked by defense counsel in its entirety as part of its deliberation and analysis of the facts and evidence.

The prosecution later filed a motion asking the court to declare a mistrial. At the hearing, the prosecution argued that defense counsel's question required the trial court to declare a mistrial because the officers' remarks on the dashcam video did not establish that Khogaly was a terrorist. The prosecution essentially argued that defense counsel's question served only to inflame the jury and no evidentiary purpose. The prosecution asserted that the jury reacted to the question and that no curative instruction could ensure a fair trial requiring a mistrial. The prosecution advised the court that it did not intend to present the dashcam video as evidence during the trial. Defense counsel countered that he asked the witness a leading question permissible on cross-examination and had a good-faith basis for doing so because the information was contained in the dashcam video. Defense counsel asserted that defendant's defense required that he had not been the first aggressor and he could present evidence of the victim's character for aggression under MRE

404(a)(2). Defense counsel argued that defendant had the right to have his case completed by one tribunal. He pointed out that the jurors agreed without hesitation that they would follow the court's instructions, but asserted that the case presented issues regarding who acted as the aggressor and whether defendant's beliefs were honest and reasonable.

The trial court asked the prosecution to address the double-jeopardy issue. The prosecution argued that an impartial verdict could not be rendered because of the nature of the question posed by defense counsel necessitating a mistrial, and double jeopardy would not attach under the circumstances. The prosecution asserted that the question tainted the jury which created manifest necessity to declare a mistrial which did not bar retrial on double-jeopardy grounds.

The court heard testimony from a law enforcement officer who attended the trial and was present in the courtroom when defense counsel asked the question. She testified that, after the question, some of the jurors looked at Khogaly's family. She admitted that she could not say what the jurors were thinking. She noticed after the proceedings resumed that the same couple jurors continued watching the family. She opined that, instead of paying attention to evidence being presented, they watched Khogaly's family. Defense counsel asserted that the question had not been improper and that persons in the back of the courtroom were reacting throughout the day.

The trial court found defense counsel's question improper because of the prejudicial nature of the question which caused manifest unfairness irreparably compromising the trial, and ruled that it must declare a mistrial. The court concluded that the curative limiting instruction could not take away the prejudice that resulted.

## C. DEFENDANT'S MOTION TO DISMISS

Following the court's declaration of mistrial, defendant moved to dismiss the charges with prejudice, arguing that double jeopardy barred retrial. He argued that even if he did not know of Khogaly's reputation for aggression, evidence of Khogaly's character for aggression could be admitted, nevertheless, to show that he was the probable aggressor because defendant relied on self-defense for his defense in a homicide case. Defendant argued that under *People v Harris*, 458 Mich 310; 583 NW2d 680 (1998), he could present evidence of the victim's character for aggression and did not have to have prior awareness of such. He pointed to the evidence of the victim's conduct in the store that established that defendant used different forms of nondeadly force in self-defense. At the hearing, defense counsel argued that the prosecution's position that no evidence established that Khogaly acted as the aggressor was untrue. Defense counsel argued that he asked a proper question, and therefore, no necessity existed for granting a mistrial. Defense counsel contended that the prosecution had its one chance to try defendant. In answer to the court's question regarding *Harris*, defense counsel clarified that one may introduce evidence that the victim had a character for aggression as part of establishing that the victim was the probable aggressor.

The prosecution argued that being a member of a terrorist organization does not necessarily show that a person is aggressive. But the question itself was inflammatory and made an impression on the jury distracting them from the issues of the case. According to the prosecution, "even when relevant, character evidence of a victim's trait for aggression is only admissible through reputation or opinion under MRE 405(a)." The prosecution argued that the question was not proper because

"an affirmative answer to this question does not offer evidence of the victim's reputation for aggression." The prosecution argued that evidence of the victim's connection to terrorism did not establish a reputation for having a character for aggression, and that the aggressor's identity could be discerned from the surveillance video of the incident. The prosecution argued that once defense counsel rang the bell it could not be unrung and a curative instruction did not suffice to cure the taint. The prosecution contended that extreme, unfair prejudice resulted because the defense labeled the victim a terrorist. The prosecution asserted that the victim's character lacked relevance and was inadmissible. The prosecution argued that unfair prejudice compromised the prosecution's right to a fair trial, manifest necessity required a mistrial, and double jeopardy did not bar retrying defendant.

The trial court noted that jeopardy attaches when a jury is selected and sworn but explained that the general rule that the prosecution is allowed one opportunity to obtain a conviction is subordinate to the public's interest in fair trials and a retrial is permitted when the mistrial has been occasioned by manifest necessity. The court stated that double jeopardy does not bar retrial when the mistrial was caused by the defendant. The court recalled that it made explicit findings at the hearing on the motion for the mistrial and determined that no reasonable means would ensure a fair trial. The court opined that only when the defendant knows of the victim's character for aggression is evidence of such admissible under MRE 404(a)(2). The court ruled that MRE 404(a)(2) precluded the question asked by defense counsel which justified declaring a mistrial because it interfered with the People's right to a fair trial, and manifest necessity required a mistrial in this case. The court held that double jeopardy did not attach and denied defendant's motion to dismiss with prejudice.

The court entered a written order denying the motion to dismiss, reasoning that (1) defense counsel's question was inadmissible because defendant did not know of the victim's alleged terrorist affiliation so it was not relevant to defendant's defense of self-defense respecting his state of mind at the time of the shooting; (2) defense counsel's question was so inflammatory that the prejudicial effect could not be removed in any way other than by declaring a mistrial; and (3) double jeopardy did not bar retrial because the mistrial was "occasioned by manifest necessity."

The court stated that, under *Harris*, when a defendant asserts self-defense, reputation evidence tending to show any aggressive or violent character of the deceased victim, even if such character is unknown to defendant, is allowable to show only that the deceased victim was the likely aggressor. The court, however, explained that such evidence although relevant may be excluded under MRE 403 if its probative value is substantially outweighed by the danger of unfair prejudice. The trial court explained:

> Here, the court recognizes that the subject of terrorism is one that kindles the passions and inflames the emotions of many in our society and, as such, can be super alarming to a jury. And, the court must balance this recognition against any amount and kind of probative value to defendant resulting from the fact that the deceased victim was apparently identified on a terrorism watch list. When doing so, the court finds that any such probative value of this evidence for its tending to show whether the deceased victim had any aggressive/violent character is substantially outweighed by the danger that the prosecution would be unfairly prejudiced by the jury's hearing that the deceased victim was possibly a terrorist.

In the end, the court finds that the question is still excluded-albeit pursuant to MRE 403 [not MRE 404(a)(2)]—because its probative value to defendant is substantially outweighed by the danger of unfair prejudice to the prosecution. Also, the court's previous rulings and reasoning therefore with respect to the corresponding issues of mistrial and double jeopardy still stand. In turn, the court concludes that, for the reasons set forth above, the denial of the motion is continued and maintained.

Defendant now appeals.

## II. STANDARD OF REVIEW

We review de novo a trial court's interpretation of a rule of evidence which is a question of law. *People v Jackson*, 498 Mich 246, 257; 869 NW2d 253 (2015). A trial court's decision regarding the admissibility of evidence is reviewed for an abuse of discretion. *People v Caddell*, 332 Mich App 27, 69; 955 NW2d 488 (2020). A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008). "[A] trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *People v Hine*, 467 Mich 242, 250; 650 NW2d 659 (2002).

We review for an abuse of discretion a trial court's ruling on a motion for mistrial. *People v Boshell*, 337 Mich App 322, 335; 975 NW2d 72 (2021). The trial court's finding of manifest necessity requiring a retrial is reviewed for an abuse of discretion. *People v Lett*, 466 Mich 206, 220; 644 NW2d 743 (2002). We review de novo a constitutional double-jeopardy challenge which is a question of law. *Id.* at 212. We review de novo the trial court's denial of defendant's motion to dismiss on the basis of double jeopardy. *People v Davis*, 472 Mich 156, 159; 695 NW2d 45 (2005). In *People v Beck*, 510 Mich 1, 14; 987 NW2d 1 (2022), our Supreme Court explained how we must review the trial court's decisions:

> This Court accords considerable deference to a judge's determination of whether there is manifest necessity justifying declaration of a mistrial. To ensure that the trial court properly exercised its discretion, the reviewing court must consider the "particular facts" of the case. If a trial judge acts irrationally or irresponsibly, his action cannot be condoned. The ultimate question is not whether this Court would have found manifest necessity, but whether the trial court abused its discretion in finding manifest necessity. [Quotation marks, citations, and alterations omitted.]

## III. ANALYSIS

Defendant argues that the trial court abused its discretion by denying his motion to dismiss and that the court's ruling subjects him to double jeopardy. We disagree.

The United States Constitution, US Const, Am V, and the Michigan Constitution, Const 1963, art 1, § 15, "prohibit placing a defendant twice in jeopardy for the same offense." *People v Ackah-Essien*, 311 Mich App 13, 31; 874 NW2d 172 (2015). When a defendant is tried by a jury, jeopardy "attaches" when the jury is selected and sworn. *People v Mehall*, 454 Mich 1, 4; 557

NW2d 110 (1997). Once the jury is impaneled, the defendant generally has a constitutional right to have his case completed and decided by that jury. *People v Henry*, 248 Mich App 313, 318; 639 NW2d 285 (2001). However, that rule "must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Lett*, 466 Mich at 215 (quotation marks and citations omitted). If a trial court declared a mistrial without the defendant's consent, retrial is generally allowed only if declaration of the mistrial was "manifestly necessary." *People v Dawson*, 431 Mich 234, 252; 427 NW2d 886 (1988).

"The constitutional concept of manifest necessity does not require that a mistrial be '*necessary*' in the strictest sense of the word. Rather, what is required is a 'high degree' of necessity." *Lett*, 466 Mich at 218, citing *Arizona v Washington*, 434 US 497, 506-507; 98 S Ct 824; 54 L Ed 2d 717 (1978).

> Manifest necessity is not a precisely defined concept and must be determined case by case. Manifest necessity appears to refer to the existence of sufficiently compelling circumstances that would otherwise deprive the defendant of a fair trial or make its completion impossible. Therefore, a trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial. [*People v Echavarria*, 233 Mich App 356, 363; 592 NW2d 737 (1999) (quotation marks, citations, and alteration omitted).]

"Neither party has a right to have his case decided by a jury which may be tainted by bias; in these circumstances, the public's interest in fair trials designed to end in just judgments must prevail over the defendant's valued right to have his trial concluded before the first jury impaneled." *Washington*, 434 US at 516 (quotation marks and citations omitted). A defendant's "valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury." *Id*. at 505. The prosecution "must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar." *Id*. The prosecution "must demonstrate 'manifest necessity' for any mistrial declared over the objection of the defendant." *Id*. Double jeopardy will not bar retrial if defense counsel's misconduct warrants a mistrial and not within the control of the prosecution or trial court. *Dawson*, 431 Mich at 252 n 45.

## A. THE EVIDENTIARY ISSUE

Whether the trial court properly declared a mistrial is a "threshold issue" that is "necessarily intertwined with the issue of determining whether double jeopardy bars retrial." *Lett*, 466 Mich at 213. Defendant argues that defense counsel's question, "You know that he's a member of a terrorist organization—" aimed at eliciting admissible evidence regarding Khogaly's tendency to engage in aggressive, violent behavior, and therefore, relevant to defendant's claim of self-defense pursuant to MRE 404(a)(2).

MRE 404 specifies the admissibility of character evidence in pertinent part as follows:

(a) Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

(1) Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same; or if evidence of a trait of character of the alleged victim of the crime is offered by the accused and admitted under subdivision (a)(2), evidence of a trait of character for aggression of the accused offered by the prosecution;

(2) When self-defense is an issue in a charge of homicide, evidence of a trait of character for aggression of the alleged victim of the crime offered by an accused, or evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a charge of homicide to rebut evidence that the alleged victim was the first aggressor[.]

MRE 405(a) permits evidence of a person's character in those circumstances in which character evidence is admissible: "In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion." However, under MRE 405(b), evidence "of specific instances of [a] person's conduct" is only admissible when the "character or a trait of character of [that] person is an essential element of a charge, claim, or defense[.]"

In *Harris*, 458 Mich 310, our Supreme Court analyzed the interplay of the evidence rules in homicide cases involving claims of self-defense, and distinguished between a defendant's use of character evidence for self-defense respecting the defendant's state of mind and use of character evidence to establish the violent character of the victim to show that the victim was the likely aggressor. The Court explained that a defendant's lack of knowledge of the victim's reputation or character for violence precludes use of such evidence to establish the defendant's state of mind in relation to the defense of the self-defense because the defendant's lack of knowledge of the victim's character could not affect the defendant's apprehensions. *Id*. at 315-317. The Court, however, concluded: "Because an important theory of defendant's case was self-defense, character evidence tending to show the victim's violent character should have been admitted to show (1) that the victim was the likely aggressor, and (2) the defendant acted out of self-defense." *Id*. at 320-321. The Court explained:

The actual violent character of the deceased, even though it is unknown to the defendant, is admissible as evidencing the deceased's probable aggression toward the defendant. It is now widely accepted that a defendant may show a pertinent trait of character of the alleged victim that bears on *whether the victim committed an act of aggression* on the particular occasion in conformity with that trait. This is so because, when a controversy arises regarding whether the deceased was the aggressor, a jury's persuasion may be affected by the character of the deceased because it will shed light on the probabilities of the deceased's action. The sole purpose for which evidence of this type is admissible is, from the victim's

general turbulent or violent character, to render more probable the evidence that tends to show an act of violence at the time he was killed.

> [T]his probability is evidently not affected in the slightest degree by the defendant's previous knowledge. The light comes from the fact that the victim was the one who was apt or likely to do such an act as the one imputed to him, and not from the defendant's knowledge of the fact. [Quoting 1A Wigmore, Evidence (Tillers rev), § 63, p 1367.]

> Because the question is what the victim probably did, not what the defendant probably thought the victim was doing, the additional element of communication to the defendant is unnecessary when using character evidence to prove the victim was the aggressor. The inquiry is one of objective occurrence, not of subjective belief.

> In contrast, where a defendant charged with murder asserts that he killed in self-defense, his state of mind at the time of the act is material because it is an important element in determining his justification for his belief in an impending attack by the deceased. The reputation of the deceased for a violent or turbulent disposition is a circumstance that would cause such a belief. However, unlike evidence tending to show that the victim was the aggressor, the deceased's violent reputation must be known to the defendant if he is to use it to show that he acted in self-defense. . . . The purpose of this evidence is to show the defendant's state of mind; therefore, it is obvious that the victim's character, as affecting the defendant's apprehensions, must have become known to him, otherwise it is irrelevant. [*Harris*, 458 Mich 315-317 (quotation marks, citations, and alterations omitted; emphasis added).]

In this case, the question posed by defense counsel based upon the remarks by law enforcement officers recorded on the dashcam video during their investigation of the incident was proper to the extent that it sought to elicit testimony from the witness to establish that the victim was the likely aggressor.[4] Because defendant had no prior knowledge of Khogaly's character or reputation, defendant could not use the question to establish that Khogaly's character or reputation affected defendant's apprehensions as part of his proof of his theory of self-defense. Nevertheless, character evidence tending to show Khogaly's violent or aggressive character was admissible to demonstrate that he was the likely aggressor. Defense counsel's asking a leading question to a prosecution witness during cross-examination to elicit character evidence to establish that Khogaly was the likely aggressor, was not, in and of itself, improper. The question sought relevant testimony that may have assisted the jury in deciding the issue whether Khogaly was the likely aggressor. Store surveillance cameras recorded defendant's encounter with Khogaly and both videos were shown to the jurors. Reasonable jurors could interpret that evidence as demonstrating

---

[4] We note the dashcam evidence was provided to the defense days before trial and that the witness who was asked the objected-to question was not endorsed as a witness until the fourth amended witness list was filed days before the trial and ten months after the death of Mr. Khogaly.

-10-

that Khogaly acted as the aggressor and circumstantial evidence of a character for aggression would serve to demonstrate that he was the likely aggressor.

The inquiry, however, does not stop there. Although relevant and admissible, the trial court could exclude such evidence under MRE 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury.

## B. MANIFEST NECESSITY FOR A MISTRIAL AND MOTION TO DISMISS

The trial court did not abuse its discretion by concluding that a manifest necessity for a mistrial existed nor by denying defendant's motion to dismiss. The record reflects that the trial court conducted a sufficient inquiry during the two hearings that it held, first respecting the prosecution's motion for a mistrial, and second defendant's motion to dismiss. At the first hearing, the court made specific findings to support its determination that manifest necessity required declaring a mistrial in this case. The court appropriately heard arguments from both sides. The court properly considered the nature of the question posed by defense counsel and the impact such question could have on the fairness of the trial. The court did not err by concluding that the prospect of a fair trial had irreparably been compromised because the subject of terrorism could cause the jurors to be alarmed, kindle their passions, and inflame their emotions.

Defendant points out that the trial court made a mistake of law in its ruling on the prosecution's motion for a mistrial by stating that evidence of the character for aggression lacked admissibility under the rules of evidence. Although the trial court made such erroneous statement at that hearing, the record reflects that the court further considered its ruling and explained at the hearing on defendant's motion to dismiss that the additional research it conducted required the court to correct and amend its ruling.

The court explained that the question appeared to be posed to elicit evidence of a character for aggression which is admissible under *Harris*. The court, however, explained further that, even though relevant and admissible, such evidence did not pass muster because it should be excluded under MRE 403. The record indicates that the trial court articulated its analysis and rationale for exclusion of such evidence and the manner in which the question, once stated, affected the fairness of the trial requiring the declaration of a mistrial. We are not persuaded that the trial court abused its discretion by concluding that defense counsel's question tainted the proceeding and that no instruction to the jury could cure that.

Moreover, the testimony presented to the trial court during the motion for a mistrial supported the court's decision because it suggested that some of the jurors visibly reacted to defense counsel's question and may have been unable or unwilling to pay proper attention to the evidence, may have been distracted, and perhaps were unable thereafter to fulfill their duty to serve as impartial, unbiased jurors. Given the circumstances and evidence supporting the trial court's determination that a curative instruction would not alleviate the taint of defense counsel's question, the trial court did not abuse its discretion by granting the mistrial. Because the trial court exercised sound discretion when handling the problem of possible juror bias and potential prejudice resulting from the question, it did not err by concluding that manifest necessity required declaration of a mistrial. The trial court also cannot be said to have erred by finding that defense counsel and not the prosecution caused the mistrial. The trial court did not err by concluding that the prosecution

met its burden of establishing manifest necessity for the mistrial declared over the objection of defendant. Accordingly, retrial is not barred by double jeopardy, and the trial court did not abuse its discretion by denying defendant's motion to dismiss.

Affirmed.

/s/ Noah P. Hood
/s/ James Robert Redford